[No. D060598. Fourth Dist., Div. One. Apr. 24, 2012.]

In re D.M. et al., Persons Coming Under the Juvenile Court Law.
SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,
Plaintiff and Respondent, v.
TOMAS L., Defendant and Appellant.

## COUNSEL

William Henry Hook, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Patrice Plattner-Grainger, Deputy County Counsel, for Plaintiff and Respondent.

Julie E. Braden, under appointment by the Court of Appeal, for Minor.

## OPINION

**McCONNELL, P. J.**—Tomas L., a minor also involved in this dependency proceeding, appeals a judgment terminating parental rights over his younger half siblings, D.M. and Noah M., and selecting adoption as the preferred permanent plan. (Welf. & Inst. Code, § 366.26.)[1] Tomas challenges the sufficiency of the evidence to support the court's findings of adoptability and the inapplicability of the sibling relationship exception to the adoption preference. (§ 366.26, subd. (c)(1)(B)(v).) We conclude substantial evidence supports the court's ruling on the sibling relationship exception. Further, as a matter of apparent first impression, we conclude Tomas lacks standing on the

---

[1] Further statutory references are also to the Welfare and Institutions Code.

adoptability finding because it does not affect any cognizable right of Tomas. We affirm the judgment, and dismiss the portion of the appeal pertaining to the issue of adoptability for lack of jurisdiction.

## FACTUAL AND PROCEDURAL BACKGROUND

In September 2009 the San Diego County Health and Human Services Agency (the Agency) removed D.M., then seven years of age, and her younger brother, Noah, from the custody of their mother, Erika R., and filed petitions on behalf of them under section 300. The petitions alleged the children were exposed to an assault by their mother against her boyfriend that resulted in her arrest. Erika had a history of domestic violence, more than two dozen referrals to child protective services, and a dependency case between 2005 and 2007 that ended in reunification. The court made true findings and sustained the petitions. The children's half sibling, Tomas, then age 10, was also made a dependent of the juvenile court.[2]

D.M. and Noah were placed together in foster care. Tomas could not be placed with them because he has behavioral problems. During the dependency proceedings, Tomas was admitted to a psychiatric facility and deemed a danger to himself and others. He was "described as being out of control, breaking windows, throwing various objects at staff and striking staff multiple times. He attempted to cut [his] wrists with broken glass." On his release he was placed in a licensed group home, where he had "several incidences of aggression towards peers and staff."

By the time of the six-month review hearing, Erika was no longer incarcerated. She had been provided with reunification services, and the court continued services for another six months. At the 12-month review hearing in January 2011, the court terminated Erika's services and scheduled a permanency planning hearing under section 366.26. Erika did not seek writ review. The record indicates she moved to Mexico before the section 366.26 hearing.

When the Agency prepared its assessment report, the foster parents of D.M. and Noah wished to adopt them. The report states: "If parental rights are terminated, [D.M.] and Noah are adoptable based on their young age, good health, charming personalities, and good looks. There are currently

---

[2] The Agency was unable to locate the presumed father of D.M. and Noah. Erika's youngest child was also brought into the dependency system, but he is not involved in this appeal.

[seven] approved adoptive families in San Diego County who have indicated that they would like to adopt a sibling group with similar characteristics of those of [D.M.] and Noah. ·There are 56 approved adoptive families out of county for both [D.M.] and Noah."

Tomas filed a petition under section 388, objecting to a permanent plan of adoption for D.M. and Noah because it would terminate their sibling relationship with Tomas. He requested standing to appear and be heard at the section 366.26 hearing. (§ 388, subd. (b).)

The Agency's addendum report advised that D.M. and Noah had been separated from Tomas since October 22, 2009; D.M. and Noah had weekly visits with Tomas, and they reported that they enjoyed seeing Tomas, but he "often fights with them and they do not like this"; and the foster mother reported they did not ask for Tomas during the week, sometimes did not want to visit Tomas, and after visits they often returned home "complaining about something that happened during the visit." The social worker understood "Tomas continues to have a lot of behavioral problems so at this point placement together is not an option because Tomas needs a higher level of care." The social worker believed that while D.M. and Noah love Tomas, "they do not share a significant sibling relationship in which it would be detrimental [to D.M.] and Noah to sever the sibling relationship," and it would be detrimental not to move forward with adoption because D.H. and Noah "are great children who are doing well in their placement and deserve to grow up in a stable and loving family."

Further, the addendum report states that if the current foster parents did not adopt D.H. and Noah, there were 12 approved adoptive families in San Diego County interested in adopting two children with similar characteristics. Further, there were 69 potential out-of-county prospective adoptive families.

In a second addendum report, the Agency advised that D.M. and Noah's foster parents had decided not to adopt them. The foster mother said she loved the children, but felt the Agency was "placing so much stress and pressure" on her. Both children told the social worker they still wanted to be adopted, even if they would have less or no contact with Tomas. D.M. said she did not want to live with Tomas because "he bothers me." Noah agreed he did not want to live with Tomas, explaining, "he hits me." The report states, "[D.M.] and Noah deserve the chance to grow up in a permanent home

with loving parents. They have been waiting for many years and are more than ready to be placed in an adoptive home. . . . [¶] Although the Agency has not located an adoptive home for the children it is clear that [D.M.] and Noah are adoptable. Both children are healthy, developmentally on target, have great personalities and are good looking."

At a hearing in August 2011, the court granted Tomas's section 388, subdivision (b) petition and granted him standing to appear. The court then proceeded to the section 366.26 matter. The court found by clear and convincing evidence that D.M. and Noah are likely to be adopted within a reasonable time, and none of the exceptions to the adoption preference applies, including the sibling relationship exception. Accordingly, the court terminated parental rights and selected adoption as the preferred permanent plans.

DISCUSSION

I

*Sibling Relationship Exception*

A

*Overview of Applicable Law*

Tomas challenges the sufficiency of the evidence to support the court's finding the sibling relationship exception to the adoption preference (§ 366.26, subd. (c)(1)(B)(v)) is inapplicable.

" 'Once reunification services are ordered terminated, the focus shifts to the needs of the child for permanency and stability.' [Citation.] 'A section 366.26 hearing . . . is a hearing specifically designed to select and implement a permanent plan for the child.' [Citation.] It is designed to protect children's 'compelling rights . . . to have a placement that is stable, permanent, and that allows the caretaker to make a full emotional commitment to the child.' [Citation.] 'The Legislature has declared that California has an interest in providing stable, permanent homes for children who have been removed from parental custody and for whom reunification efforts with their parents have been unsuccessful.' " (*In re Celine R.* (2003) 31 Cal.4th 45, 52–53 [1 Cal.Rptr.3d 432, 71 P.3d 787] (*Celine R.*).)

Adoption is the Legislature's preferred permanent plan. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573 [32 Cal.Rptr.2d 535] (*Autumn H.*). " 'Only if adoption is not possible, or if there are countervailing circumstances, or if it is not in the child's best interests are other, less permanent plans, such as guardianship or long-term foster care considered.' [Citation.] Adoption, of course, requires terminating the natural parents' legal rights to the child; guardianship and long-term foster care leave parental rights intact. After the parent has failed to reunify and the court has found the child likely to be adopted, it is the parent's burden to show exceptional circumstances exist." (*Id.* at p. 574.)

■ At a section 366.26 hearing, the court must terminate parental rights and free the child for adoption if it determines by clear and convincing evidence the child is adoptable within a reasonable time, and the parents have not shown that termination of parental rights would be detrimental to the child under any of the statutory exceptions to adoption found in section 366.26, subdivision (c)(1)(B)(i) through (vi).) (§ 366.26, subd. (c)(1).) An exception applies only if the "court finds a compelling reason for determining that termination would be detrimental to the child." (§ 366.26, subd. (c)(1)(B).)

The sibling relationship exception arises when adoption would create "substantial interference with a child's sibling relationship." (§ 366.26, subd. (c)(1)(B)(v).) A sibling who is a dependent of the juvenile court, such as Tomas, "may petition the court to *assert a relationship as a sibling* related by blood, adoption, or affinity through a common legal or biological parent to a child who is . . . a dependent of the juvenile court, and may request visitation with the dependent child, placement with or near the dependent child, or consideration when determining or implementing a case plan or permanent plan for the dependent child." (§ 388, subd. (b), italics added.)

■ "To show a substantial interference with a sibling relationship the parent [or sibling granted standing] must show the existence of a significant sibling relationship, the severance of which would be detrimental to the child. Many siblings have a relationship with each other, but would not suffer detriment if that relationship ended. If the relationship is not sufficiently significant to cause detriment on termination, there is no substantial interference with that relationship." (*In re L. Y. L.* (2002) 101 Cal.App.4th 942, 952 [124 Cal.Rptr.2d 688], fn. omitted (*L.Y.L.*).)

The court should consider "the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing

contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption." (§ 366.26, subd. (c)(1)(B)(v).)

The sibling relationship exception "permits the trial court to consider possible detriment to the child being considered for adoption, but not a sibling of that child." (*Celine R., supra*, 31 Cal.4th at p. 54.) In other words, the court could not consider detriment to Tomas, but only detriment to D.M. and Noah.

A sufficiency of the evidence standard of review applies to the sibling relationship exception. (*L.Y.L., supra*, 101 Cal.App.4th at p. 947.) "On review of the sufficiency of the evidence, we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order." (*Autumn H., supra*, 27 Cal.App.4th at p. 576.) The appellant has the burden of showing that substantial evidence does not support the court's finding. (*L.Y.L., supra*, at p. 947.)

B

*Substantial Evidence Analysis*

At the hearing, the court relied on the Agency's reports, discussed above. Additionally, the social worker for D.M. and Noah testified the children had not lived with Tomas for nearly two years, and they could not be placed with him because of his special needs. The Agency recommended a group home as Tomas's permanent plan.

The children had weekly hour-long visits with Tomas, and the social worker had observed two visits. D.M. and Noah enjoyed the first visit. They played tag with Tomas, and hugs were exchanged. The second visit "wasn't as good." Within the first two minutes, Tomas upset D.M. and made her cry. Then Tomas "was teasing the kids and not really listening, or being a bit rough with them. So the kids kind of didn't want to play with him." Both D.M. and Noah, however, told the social worker they would like continued visits with Tomas.

The social worker disagreed with Tomas's argument the sibling relationship exception militates against adoption. The social worker explained D.M. and Noah have been in and out of the juvenile dependency system for a total of four years of their lives, and they are "going to get older, and they are not

going to be adoptable." The social worker acknowledged a sibling relationship, but she qualified that by observing "I don't think it's a strong sibling relationship," and "I think that the benefits of adoption clearly outweigh the sibling relationship that does exist."

Additionally, both D.M. and Noah told the social worker they wanted to be adopted even if it meant they may see their brother more infrequently, or even not at all. The Agency, however, intended to encourage an adoptive family to continue sibling visitation. There were 13 prospective adoptive families in San Diego County willing to adopt sibling groups, and the families were willing to allow sibling contact.

The social worker for Tomas testified she observed two hour-long visits among him, D.M. and Noah. Both visits were generally positive and ended "[w]ith a hug and a kiss." D.M. and Noah appeared happy to see Tomas.

The court appointed special advocate (CASA) for D.M. and Noah testified she had spent many hours with them "and they are lovely children." Further, "they are very adoptable children in spite of their ages," and "they need a permanent family that will parent them actively, something that they have not [had] during their lives." The CASA added, "they do have a relationship with Tomas, which I have observed several times. But I just don't see how that could outweigh their need and their just tremendous desire to have a real family."

█ In finding the sibling relationship exception inapplicable, the court explained: "[T]he point of view of [D.M.] and Noah is the perspective through which the Court must examine the evidence. I think that summarizing the evidence leads to the conclusion, that [all three children] clearly have a relationship. They know they are siblings. They enjoy seeing each other despite the fighting, despite what goes on at some of the visits. [¶] Nonetheless, when one goes through the statutory elements [(§ 366.26, subd. (c)(1)(B)(v))], one cannot find that there is such a strong bond between these children that the need for ongoing contact between Tomas and the other two children outweighs their need for permanence. [¶] The children notably told the foster mother, . . . at least once, that they really weren't interested in overnights or more extended visits with Tomas even though she offered them. They were quite content with the weekly contact where they play with each other and see each other. [¶] The children truly had not been raised in the same home. They have been raised for almost half their lives by the system, [D.M.] and Noah. And while they have got common experiences that certainly occurred while they were home together, probably their strongest

emotional shared experience is the removals from mom and placement in the system. [¶] So I can't find based on the evidence before us that their need for ongoing contact weighs more heavily than their need for permanence."

We conclude substantial evidence supports the court's assessment, and it is a reasonable assessment under all the circumstances. While D.M. and Noah have a pleasant relationship with Tomas most of the time, he did not show the termination of the sibling relationship is sufficiently detrimental to D.M. and Noah to preclude termination of parental rights. "The court must balance the beneficial interest of the child in maintaining the sibling relationship, which might leave the child in a tenuous guardianship or foster home placement, against the sense of security and belonging adoption and a new home would confer." (*L.Y.L., supra*, 101 Cal.App.4th at p. 951.)

Tomas's reliance on *In re Naomi P.* (2005) 132 Cal.App.4th 808 [34 Cal.Rptr.3d 236] (*Naomi P.*), is misplaced. In *Naomi P.*, the appellant was a social services agency, and the issue was whether substantial evidence supported the juvenile court's finding that the sibling relationship exception to adoption was *applicable*. The appellate court affirmed the ruling, explaining, "It is not our role to interfere with the trial court's assessment of the witnesses' demeanor and credibility." (*Id.* at p. 824.) The issue here is whether substantial evidence supports the court's finding the exception is *inapplicable*, and we consider the evidence in the light most favorable to the court's ruling. (*Autumn H., supra*, 27 Cal.App.4th at p. 576.)

II

*Lack of Standing to Address Adoptability*

Tomas also challenges the sufficiency of the evidence to support the court's finding that D.M. and Noah are generally adoptable. Tomas points out that before the section 366.26 hearing, the foster parents had decided not to adopt, and no other specific prospective adoptive family had been identified.

We agree with the Agency, however, that Tomas lacks standing to raise the adoptability issue. " 'In juvenile dependency proceedings, as in civil actions generally [citation], only a party aggrieved by the judgment has standing to appeal. [Citations.]' " (*In re Harmony B.* (2005) 125 Cal.App.4th 831, 838 [23 Cal.Rptr.3d 207]; see *L.Y.L., supra*, 101 Cal.App.4th at p. 951; *In re Erik P.* (2002) 104 Cal.App.4th 395, 402 [127 Cal.Rptr.2d 922]; *In re Esperanza C.* (2008) 165 Cal.App.4th 1042, 1053 [81 Cal.Rptr.3d 556].) "To be aggrieved, a party must have a *legally cognizable interest* that is injuriously affected by the court's decision. [Citation.] The injury must be immediate and substantial, and not nominal or remote." (*L.Y.L., supra*, 101

Cal.App.4th at p. 948, italics added.) "An appellant must show prejudicial error affecting his or her interest in order to prevail on appeal. [Citation.] An appellant cannot urge errors which affect only another party who does not appeal." (*In re Vanessa Z.* (1994) 23 Cal.App.4th 258, 261 [28 Cal.Rptr.2d 313].)

"A 'lack of standing' is a jurisdictional defect." (*Hudis v. Crawford* (2005) 125 Cal.App.4th 1586, 1592 [24 Cal.Rptr.3d 50].) When an appellant lacks standing, the appeal is subject to dismissal. (*Ibid.*)

If the court finds at a section 366.26 hearing that a dependent child is adoptable, it must terminate parental rights unless it determines a specified exception to the adoption preference is applicable. (§ 366.26, subd. (c)(1)(B).) The court's finding that D.M. and Noah are generally adoptable—before addressing whether any exception to adoption applies—does not injure any cognizable right of Tomas.

■ Under section 388, subdivision (b), Tomas had the right to petition to be heard at the section 366.26 hearing "to assert a relationship as a sibling" (§ 388, subd. (b)), an issue that does not concern the adoptability finding. "The section 388, subdivision (b) petition does not call upon the court to weigh the detriment of interfering with the sibling relationship against the advantages to the adoptive dependent of adoption, but merely to determine whether there is a sufficiently close relationship between the siblings that the nonadoptive sibling *should be permitted to urge consideration of this factor* when a permanency plan for the adoptive child is considered at the section 366.26 hearing." (*In re Hector A.* (2005) 125 Cal.App.4th 783, 795 [23 Cal.Rptr.3d 104], italics added.)

The court granted Tomas's petition and allowed him to urge that the court apply the sibling relationship exception. Tomas was not aggrieved by the adoptability finding, but solely by the finding the exception is inapplicable. Thus, we lack jurisdiction to consider this portion of Tomas's appeal.[3]

---

[3] In any event, substantial evidence supports the court's ruling on adoptability. "The issue of adoptability posed in a section 366.26 hearing focuses on the *minor*, e.g., whether the minor's age, physical condition, and emotional state make it difficult to find a person willing to adopt the minor. [Citations.] Hence, it is not necessary that the minor already be in a potential adoptive home or that there be a proposed adoptive parent 'waiting in the wings.' " (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649 [28 Cal.Rptr.2d 82].) "Although a finding of adoptability must be supported by clear and convincing evidence, it is nevertheless a low threshold: The court must merely determine that it is 'likely' that the child will be adopted within a reasonable time." (*In re K.B.* (2009) 173 Cal.App.4th 1275, 1292 [93 Cal.Rptr.3d 751]; see § 366.26, subd. (c)(1) ["The fact that the child is not yet placed in a preadoptive home nor with a relative or foster family who is prepared to adopt the child, shall not constitute a basis for the court to conclude that it is not likely the child will be adopted."].) By all accounts D.M.

## DISPOSITION

The judgment is affirmed. The appeal is dismissed to the extent it pertains to the issue of adoptability.

Benke, J., and McDonald, J., concurred.

---

and Noah are lovely children despite the upheaval in their lives, and there were many prospective adoptive families for them.