Filed 2/26/13  In re Christian R. CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

| | |
|---|---|
| In re CHRISTIAN R., a Person Coming Under the Juvenile Court Law. | 2d Juv. No. B242322 (Super. Ct. No. J-1252179) (Santa Barbara County) |
| SANTA BARBARA COUNTY CHILD WELFARE SERVICES,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MARIA G.,<br><br>    Defendant and Appellant. | |

Maria G. (mother) appeals an order of the juvenile court terminating her parental rights and establishing adoption as the permanent plan for her son, Christian. (Welf. & Inst. Code, § 366.26, subd. (c)(1).)[1]  Mother contends that the juvenile court erred by finding that the beneficial parental and sibling relationship exceptions did not apply to Christian's adoption.  (§ 366.26, subd. (c)(1)(B)(i)&(v).)  We affirm.

### BACKGROUND

On August 29, 2007, Santa Barbara County Child Welfare Services (CWS) first detained then four-year-old Christian and placed him in foster care.  Officers had

_____

[1] All statutory references are to the Welfare and Institutions Code unless otherwise stated.

called CWS after they arrested mother at home for possession of methamphetamine, and took her into custody. On August 31, 2007, CWS filed a failure to protect petition (§ 300, subd. (b).) The petition cited mother's recent arrest; her possession of methamphetamine in the home she shared with Christian; her failure to take Christian to school when she was "too busy;" her criminal history; and his father's criminal history.

In mid-September 2007, CWS placed Christian with his maternal great-grandmother. On September 25, 2007, she left CWS a voicemail message which said she could no longer care for Christian and she had "'dropped' [him] off" at maternal grandmother's home. On September 26, CWS placed Christian in foster care with an unrelated family. It later placed him with maternal grandmother.

Following her December 2007 release from jail, mother entered a sober living program. In March 2008, CWS recommended that the court return Christian to mother's care, with family maintenance services, and bypass reunification services for his father, who was in prison and had not displayed a commitment to Christian.[2] On March 24, 2008, the court returned Christian to mother's care. They lived in maternal grandmother's home.

On September 2, 2008, while appearing in court to pay a traffic fine, mother was arrested for a probation violation. She was placed in custody, reportedly for two weeks. Christian remained in maternal grandmother's home, for an extended visit. A September 22, 2008, addendum reported that mother would not be released for several months.

On October 8, 2008, CWS filed a section 387 supplemental dependency petition alleging that the previous disposition had not been effective; that Christian's mother and father were incarcerated; and maternal grandmother was not able or willing to continue caring for Christian. CWS recommended that Christian be placed with his paternal aunt. The court adopted its recommendation and issued its proposed orders, including supervised visitation for mother.

---

[2] Christian's father is not a party to the appeal.

In its November 17, 2008 Jurisdiction/Disposition report, CWS recommended that the court order reunification services for mother. Mother's earliest prison release date would be in February 2009.

On January 8, 2009, the court conducted combined jurisdiction and disposition proceedings. The court found the October 8, 2008, section 387 petition to be true. It ordered additional reunification services for mother until March 2, 2009 (the 18-month review date).

In its March 2, 2009 status report, CWS recommended that Christian remain in out-of-home placement and that mother receive six more months of reunification services. During her incarceration, she had maintained contact with Christian via telephone calls and letters. After her release in February 2009, mother moved into maternal grandmother's home "temporarily," started a job, and arranged to participate in substance abuse groups, drug testing and other programs. On March 2, 2009, the court granted mother reunification services, and adopted the orders proposed by CWS. Mother's case plan required her to comply with all laws and probation requirements, with no arrests or convictions; stay free from illegal drugs; take all required drug tests; and protect Christian's safety.

On July 5, 2009, while Christian was visiting mother, she was arrested at maternal grandmother's residence. Several of mother's juvenile friends were in the home or its front yard, including an intoxicated 16-year-old who had been fighting. Officers found a beer keg that was 75 percent empty. Christian's father was present. He smelled of alcohol, was agitated and did not cooperate with the officers. Mother admitted that she had been fighting and drinking. Officers charged mother and Christian's father with contributing to the delinquency of the minors. (Pen. Code, § 272.)

In its August 31, 2009 report, CWS recommended that the court terminate mother's reunification services, leave Christian in out-of-home placement, and schedule a permanency planning hearing. After mother's recent arrest, Christian, who was then six, told the CWS social worker that he knew what it like to ride with mother and her boyfriend when they were stealing things and running from the police; he knew mother

3

was in jail; and he knew they took her when he was visiting her on the 4th of July weekend. He said he loved his mother, and would like to return to her, but he was doing fine with his aunt. His aunt told CWS she would adopt Christian if mother could not reunite with him.

On September 24, 2009, CWS filed a section 387 petition alleging that the prior disposition was not effective because Christian's aunt could no longer care for him, and CWS did not approve the home of maternal grandmother for his placement. CWS placed him in an emergency shelter. In the September 28, 2009 detention report, CWS recommended that the court terminate mother's reunification services. CWS assessed Christian and concluded he was adoptable.

On September 29, 2009, the court granted the section 387 petition, terminated mother's reunification services, and scheduled a permanency planning hearing. It later ordered a court-appointed special advocate (CASA) for Christian.

On January 13, 2010, mother filed a section 388 petition asking the court to return Christian to her care, with family maintenance services. She had complied with her case plan and Christian had been on an extended visit with her for more than 30 days. In a January 21, 2010 report, CWS recommended that the court return Christian to mother's care. On January 21, 2010, the court granted mother's petition, returned Christian to her care, and ordered maintenance services. Among other things, her case plan required mother to stay free from illegal drugs; protect Christian's safety; comply with all required random drug tests; and follow all rules and conditions of probation, with no arrests.

In its July 19, 2010 six-month report, CWS recommended that the court grant mother six more months of family maintenance services. Mother and Christian had moved into an apartment in June 2010. On July 19, the court adopted the CWS recommendations and issued its proposed orders.

In its January 24, 2011, 12-month report, CWS stated that mother had tested positive for methamphetamine on July 15, 2010 and August 19, 2010. She denied that she used drugs on either date. Mother missed two tests in August and two tests in

4

September. She claimed that her work and problems with her employer caused her to miss the tests. CWS recommended that the court grant her more family maintenance services. The court did so on January 24, 2011.

On June 27, 2011, CWS filed a section 387 supplemental petition, with multiple allegations, including the following: mother was arrested during a search of her home on June 23, 2011; officers found methamphetamine and marijuana in her room, within Christian's reach; a male parolee with an outstanding warrant was in mother's home; mother sometimes left Christian under the supervision of male parolees; and she failed to contact CWS to inform them of her whereabouts. CWS took Christian and his two-month-old half-brother into protective custody on June 23rd. On June 27, 2011, it placed them in the same concurrent placement home.

CWS reported that between March 17, 2011 and mother's June 23, 2011 arrest date, she did not contact CWS or advise them of her whereabouts. During that period, CWS had made thirteen attempts to meet with her. In March, mother advised CWS that she was five months pregnant. When reminded that CWS must approve anyone who would be around Christian, mother said the baby's father was never around Christian, and would not be involved in his life. The baby's father reported that he had been living with mother. Mother had avoided the attempts of Christian's CASA to meet with her. Christian seemed to be flourishing in his foster home. He was always happy to see his CASA, and happy to return to his foster family, who provided him with a nurturing, positive environment.

On August 22, 2011, the court conducted combined jurisdiction and disposition proceedings on the section 387 petition. It considered multiple CWS reports and a CASA report. CWS recommended that the court sustain the petition; order that Christian remain in out-of-home care, with no further reunification or maintenance services for mother; and set a permanency planning hearing. The CASA supported those recommendations. The court sustained the section 387 petition, terminated mother's services, and set a permanency planning hearing.

On May 1, 2012, the court conducted a contested section 366.26 permanency hearing. CWS submitted several reports. The CWS social services worker who prepared the section 366.26 report testified that Christian's permanent plan was adoption by a non-related extended family member (NREFM). The NREFM was one of Christian's teachers. The NREFM family intended to facilitate ongoing contact between nine-year old Christian and his infant half-brother. CWS concluded that Christian's need for stability outweighed his need to keep contact with his sibling, assuming such contact could not continue. For the last four years, Christian had an unstable life, with frequent moves between mother's care and foster placement. He deserved stability and the chance to be a child in a stable family. Although Christian displayed love and affection for his infant half-brother, most of the time he wanted to be outside playing with his foster siblings.

Mother testified that she had daily one or two minute telephone visits with Christian. They always discussed when they would next meet and expressed their mutual love. She also testified that Christian loved his half-brother and that being a big brother meant a lot to him. When questioned about a prosecutor's statement that she could be "facing jail time" following a pending court hearing, mother responded that she believed the statement was incorrect.

Jennifer Barretto, mother's Project Preemie counselor, testified that she observed Christian's visits with mother, and that they have a close, affectionate and loving relationship. Mother parented Christian appropriately during the visits. He was happy to see her and had difficulty separating from her. Alice Flowers, a Project Preemie manager, gave similar testimony. Flowers also testified that Christian loves and shows affection toward his half-brother.

The juvenile court concluded that mother had failed to meet her burden of establishing that the benefits from maintaining Christian's parental and sibling relationships outweighed the benefits of adoption. The court found clear and convincing evidence that Christian was adoptable, and was likely to be adopted. It terminated the parental rights of mother and father.

DISCUSSION

Mother contends that the juvenile court erred by finding that the beneficial parental and sibling relationship exceptions did not apply to Christian's adoption. (§ 366.26, subd. (c)(1)(B)(i) & (v).)  We disagree.

We review the court's findings that the parental and sibling benefit exceptions to adoption do not apply for substantial evidence.[3]  (*In re Autumn H*. (1994) 27 Cal.App.4th 567, 576 [parental]; *In re D.M*. (2012) 205 Cal.App.4th 283, 291 [sibling]).)  Under this standard, we must affirm if the findings are supported by evidence that is reasonable, credible, and of solid value.  (*In re Christina A*. (1989) 213 Cal.App.3d 1073, 1080.)

The parental benefit exception provides that parental rights shall not be terminated if "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  (§ 366.26, subd. (c)(1)(B)(i).)  Only in the "extraordinary case" can a parent establish an exception because the permanent plan hearing occurs "after the court has repeatedly found the parent unable to meet the child's needs."  (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350.)  The parent bears the burden of proving the exception.  (*Ibid*.)  To meet that burden, a parent must show more than frequent and loving contact or pleasant visits.  (*In re Derek W*. (1999) 73 Cal.App.4th 823, 827.)  "Interaction between natural parent and child will always confer some incidental benefit to the child. . . .  The relationship arises from day-to-day interaction, companionship and shared experiences."  (*In re Autumn H, supra,* 27 Cal.App.4th at p. 575.)  The parent must show he or she occupies a parental

---

[3] As frequently noted, some courts have reviewed such findings for an abuse of discretion.  (See, e.g., *In re Jasmine D., supra,* 78 Cal.App.4th 1339, 1351 [application of parental benefit exception is a "quintessentially discretionary determination"].)  However, "[t]he practical differences between the two standards of review are not significant.  '[E]valuating the factual basis for an exercise of discretion is similar to analyzing the sufficiency of the evidence for the ruling. . . .  Broad deference must be shown to the trial judge.  The reviewing court should interfere only "'if [it] find[s] that under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he did.'. . .'"  [Citations.]"  (*Ibid*.)

role in the child's life, resulting in a significant, positive, emotional attachment from child to parent. (*Ibid.; In re Elizabeth M*. (1997) 52 Cal.App.4th 318, 324.)

After noting that mother's visits with Christian appeared to be no more than play dates with a loving adult, the court found that she did not establish that she had a parental role or relationship with Christian. The evidence supports that finding. For the four-year period preceding the permanent plan hearing, Christian had been removed from mother's care multiple times. Her 2007 arrest resulted in the filing of the initial dependency petition, when Christian was just four years old. Mother's three subsequent arrests required CWS to file section 387 petitions in 2008, 2009, and 2011. Much of the time, mother was in custody and unavailable to fulfill a parental role. When Christian was in her care for limited periods, mother failed to occupy an appropriate parental role in his life. Christian witnessed three of mother's arrests. At age six, he knew what it was like to ride with mother and her boyfriend while they were stealing items and running from the police. The trial court also found that the benefits of maintaining the parent-child relationship did not outweigh Christian's needs for a stable and permanent home. The evidence also supports that finding. Christian lacked a stable home for more than four years, and mother did not occupy a significant parental role in his life. It is uncontroverted that Christian's proposed adoptive NREFM family is committed to providing him a safe and nurturing home.

We also reject mother's claim that the beneficial sibling relationship exception applies to Christian's adoption. The sibling relationship exception applies if termination of parental rights would be detrimental to the child because "[t]here would be substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption." (§ 366.26, subd. (c)(1)(B)(v).) Here, the juvenile court struck the balance in favor of adoption. It did not

8

err.  Christian was nine years old and his half-brother was barely a year old at the time of the section 366.26 hearing, and thus unknown to Christian for most of his life.  The NREFM family planned to maintain contact between Christian and his half-brother.  A trial court must balance the benefit of maintaining the sibling relationship against the benefit the child would derive from being adopted.  "Reflecting the Legislature's preference for adoption when possible, the 'sibling relationship exception contains strong language creating a heavy burden for the party opposing adoption.  It only applies when the juvenile court determines that there is a "compelling reason" for concluding that the termination of parental rights would be "detrimental" to the child due to "substantial interference" with a sibling relationship.'  [Citation.]"  (*In re Celine R.*(2003) 31 Cal.4th 45, 61.)

DISPOSITION

The judgment is affirmed

<u>NOT TO BE PUBLISHED.</u>

PERREN, J.

We concur:

GILBERT, P.J.

YEGAN, J.

9

Arthur A. Garcia, Judge

Superior Court County of Santa Barbara

_____

Lori Siegel, under appointment by the Court of Appeal, for Defendant and Appellant.

Dennis A. Marshall, County Counsel, and Maria Salido Novatt, Senior Deputy for Plaintiff and Respondent.