Filed 2/26/14  In re C.H. CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re C.H., a Person Coming Under the Juvenile Court Law. | B250693 (Los Angeles County Super. Ct. No. CK70745) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. JASON B. et al., Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, Jacqueline Lewis, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed.

Kate M. Chandler, under appointment by the Court of Appeal, for Defendant and Appellant Cl. H.

Christopher R. Booth, under appointment by the Court of Appeal, for Defendant and Appellant Jason B.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel and Jessica S. Mitchell, Deputy County Counsel for Plaintiff and Respondent.

## I.  INTRODUCTION

Cl. H., the mother, and Jason B., the father, appeal the order terminating their parental rights following a Welfare and Institutions Code[1] section 366.26 hearing.  The child, C.H., was residing with the prospective adoptive father.  Also residing in the residence was the prospective adoptive father's mother.  The parents argue the juvenile court erred by finding the child was adoptable.  We affirm the parental rights termination order.

## II.  BACKGROUND

### A.  Procedural History

On May 12, 2011, the Los Angeles County Department of Children and Family Services (the department) filed a petition on behalf of the child.  The department alleged jurisdiction under section 300, subdivision (b) for failure to protect.  The department alleged:  the mother and the father engaged in a violent altercation on February 5, 2011 in the presence of the minor; the father pushed the mother onto a bed, got on top of her and choked her; and the father had a history of illicit drug abuse and currently used marijuana, which rendered him incapable of providing regular care.

On May 12, 2011, at the detention hearing, the juvenile court found the child was a person described in the Welfare and Institutions Code.  The child was not present at the detention hearing.  The juvenile court issued a protective custody warrant for the child and ordered him detained in shelter care pending the next hearing.  The juvenile court also issued an arrest warrant for the parents.  The juvenile court ordered notice be provided to the Cherokee tribes in the event the child was subject to the Indian Child Welfare Act.  The juvenile court also signed a mental health services order for the child.

---

[1]  All further code references are to the Welfare and Institutions Code.

Monitored visits were ordered for the mother and the father in a neutral setting. The mother was not to monitor the visits. On May 23, 2011, the juvenile court recalled the warrants after police officers located the child at the home of his parents.

On July 14, 2011, the juvenile court sustained the section 300 petition. The petition was sustained on domestic violence grounds and drug use allegations were sustained as to the father. The child was ordered removed from the parents and suitably placed. The father was ordered to participate in: individual counseling; parenting, alcohol and drug counseling; random alcohol and drug testing; substance abuse counseling; and domestic violence counseling. The mother was ordered to participate in individual counseling, parenting, domestic violence support groups, and random drug tests. A department-approved monitor was ordered present at all of the parents' visits. The juvenile court set a six-month hearing for January 12, 2012. At the June 28, 2011 mediation, the juvenile court ordered the child detained with the maternal grandmother pending the next hearing.

At the May 8, 2012 hearing, the juvenile court found: the appropriate permanent plan was for the child to be adopted; the mother made partial progress to mitigate the causes necessitating foster care placement; and the father made minimal progress. The department was ordered to prepare an assessment plan and initiate an adoptive home study. The matter was set for a permanent plan hearing on September 20, 2012. It was continued to June 26, 2013.

On June 26, 2013, the juvenile court held a contested section 366.26 hearing. The juvenile court ordered parental rights terminated for both parents. The juvenile court found by clear and convincing evidence the child was adoptable. The juvenile court stated: "In reviewing and being on this case for the last couple of years, the Court does not see that [the child] is not adoptable. We've had some issues finding the appropriate fit. But he is now in a home that wishes to adopt him, with an approved home study. So there are no legal impediments to the adoption." The parents subsequently appealed.

3

## B. Factual Matters

### 1. Detention Report

On May 12, 2011, the social worker filed the detention report. On February 7, 2011, the social worker received a police report regarding a fight between the mother and the father. The father and the mother got into an argument and he grabbed her by the neck and threw her across a hotel room. No injuries to the mother were observed. The father had left the scene when the police arrived. The child was present during the incident. Also present was C.R., the child's half-sister and the mother's five-year-old daughter. C.R.'s legal guardian is a paternal grandmother. The mother related a history of domestic violence and said she would be checking into a shelter with the children.

The mother said she had been living with the father on and off for the last two years. The mother said that she did get into an argument with the father, her boyfriend, because she thought he was cheating. She denied he put his arms around her neck or threw her, though he did push her aside. She said she called the police to get him into trouble. She stated the history of domestic violence was with J.R., C.R.'s father. The child appeared dressed in clean clothes and attached to the mother.

On February 8, 2011, the social worker interviewed the father. He denied grabbing the mother by the neck and throwing her, though he did admit to pushing her aside to leave. The father admitted to smoking marijuana the preceding Sunday and his last prior use was two months earlier.

On February 16, 2011, the police reported having difficulty contacting the mother and father. They were not at the hotel. A team decision making meeting with the department was scheduled for February 18, 2011, with the family. On February 18, 2011, the social worker arrived at the motel room to drive the family to the meeting. The social worker telephoned multiple times prior to arriving at the address, but did not receive an answer. The mother answered the door with the child behind her. The mother

4

refused to leave because a sister was coming soon who was dealing with some problems. The social worker rescheduled the meeting to March 3, 2011.

On March 3, 2011, the social worker arrived at the hotel and discovered the family had left. The social worker attempted to contact them at an address the mother provided to the police. Until April 8, 2011, the social worker had difficulty communicating with the mother. On that date, the social worker finally received a telephone call from the mother. The mother stated she had moved to another motel and that she had never received or seen the previous voice mails and phone calls. The mother stated she, the father, and the child could attend a meeting on April 18, 2011. The mother did not appear at the April 18, 2011 meeting.

On May 9, 2011, the social worker again attempted to locate the family at their last known motel address but learned they had moved out. The social worker noted the mother's history of hiding C.R., the child's half-sister, from the juvenile court and the department. The social worker also noted the parents' history of domestic violence and marijuana use. The social worker concluded intervention by placing the child into protective custody was necessary.

On May 10, 2011, the department submitted to the court a request for a protective custody warrant for the child and an arrest warrant for the parents. On May 12, 2011, the juvenile court issued the warrants and an order for the child to receive mental health services.

On May 19, 2011, the social worker received information regarding the current address of the mother. With the help of police, the social worker arrived at the address and located the mother with the child. The social worker detained the child.

2. Jurisdiction report

On June 2, 2011, the social worker prepared a jurisdiction report. The child's half-sister, C.R., had no Indian ancestry. On May 20, 2011, the mother identified herself as African-American and nothing else. The mother denied hiding the child from the

social worker, but was homeless and did not have a working phone at the time. The social worker sent the mother to take a drug test.

On May 20, 2011, the father called the social worker. The father stated he did not understand why the child needed to be detained. He denied any domestic violence had occurred. The social worker asked if the father would be willing to undergo a drug test. The father agreed to take a drug test. The social worker asked the father to appear at the office for drug testing. But the father never appeared for the drug testing at the department office. The child's paternal aunt volunteered to take care of him and to undergo a live scan. But she had not undergone a live scan for the department as of the preparation of the June 2, 2011 report.

The social worker noted the mother had a history of non-cooperation with the department. Reunification services had been terminated concerning C.R., the child's half-sister. The social worker thus recommended reunification services be denied for the mother as to the child. The social worker likewise recommended no reunification services for the father. This was because he had not participated in the department's services and his whereabouts were unknown. The social worker recommended the court find the petition true. The mother had a history of abducting her children from the department. Additionally, the mother was in denial of the February 5, 2011 domestic violence incident which was a great risk to the child's safety. The father had engaged in domestic violence in front of the child, which created an unsafe environment for the child. The father had assisted the mother in keeping the child's whereabouts unknown.

3. Additional pre-adjudication submission

In a last minute information for the court document, the department reported the social worker contacted the mother. The mother was asked if there were other family members available to take care of the child. The mother responded there was really no one in her family who could take care of him and it was best the child stayed in foster care. The department also recommended foster care for the child.

6

## 4. January 12, 2012 Status Review Report

The department reported that on October 31, 2011, the foster mother had submitted a seven-day notice to move the child. The foster mother did not wish to communicate with the mother. This was because the mother would ask about the foster mother's private life. The mother would demand privileges from the foster mother. The foster mother agreed to continue if the mother stopped asking personal questions.

The child was seen at Martin Luther King, Jr. Hospital on June 24, 2011. The child received psychotherapy services on October 19, 2011, where he exhibited crying/tearfulness and aggressive tantrum behaviors when his wishes or requests were denied. On January 3, 2012, the foster mother reported the child fell down and scratched his face because he did not get his way immediately. The foster mother explained the child was very aggressive with other children at the home and she had to watch him because he pushed and fought with them. The foster mother stated she enjoyed taking care of the child but his tantrums and the mother's behavior made it difficult to keep the placement secure.

The department attempted to link the child with therapeutic services. According to Candice Safir, a mental health specialist, the child's treatment began on September 5, 2011. On October 19, 2011, it was recommended that the child continue therapeutic treatment until discharge. Ms. Safir attempted to contact the mother. The mother needed to participate in the child's sessions for his therapy to be successful. The mother did not return Ms. Safir's phone calls. Nor did the mother appear at a department visit to meet Ms. Safir. Services were not implemented for the mother.

The social worker noted the mother was scheduled for 24 visits. Out of those 24 scheduled visits, the mother failed to appear 5 times. Five visits were cancelled. When the mother visited, she and the child interacted well together. The mother held and kissed the child and played with him. During some visits, the child would throw a tantrum, become physical and hurt himself. The mother would interact in consoling the child.

7

The department assessed the foster mother was providing the child with adequate shelter and safety. The foster mother attended to the child's medical and psychological issues. The social worker recommended continuation of the matter for a permanent plan hearing.

### 5. March 22, 2012 Addendum Report

On March 22, 2012, the social worker submitted an addendum to the January 12, 2012 report. The social worker noted the mother missed several classes regarding parenting. The mother refused to enroll in a narcotic treatment program and missed 10 drug tests. The mother's last monitored visits were of very poor quality. During the second-to-last visit, the mother showed the child an inappropriate video of a youngster cursing. The mother was on the phone with the father for 15 minutes. The mother was on the telephone with a girlfriend talking about being drunk the night before and hung over at the visit. The social worker terminated the visit.

During the March 9, 2012 visit, the mother was again on the telephone with the father. The social worker informed the mother that she could not be on the telephone. At that point, the mother stepped out of the visit and left the child with the social worker. The child was very aggressive with the mother and she displayed limited parenting skills.

### 6. April 19, 2012 Addendum Report

The social worker described a March 30, 2012 monitored visit. This visit was very poor quality as the mother was on the telephone and kept asking when it was going to be over. The mother appeared to not want to be bothered with the child. The visit was terminated.

A letter was sent on January 17, 2012, to the father. The father has made no contact with the department at this case's inception. The mother has not provided the

8

father's current address to the department. The department recommended reunification services for the mother be terminated.

### 7. April 19, 2012 Last Minute Information Document

The foster mother wanted the child referred to the regional center for services. The foster mother noted several tantrums and erratic behaviors at the beginning of placement, but the child had calmed down tremendously since being in her home. She expressed a desire to have the child evaluated again for mental health issues. The foster mother was most definitely interested and even willing to adopt the child.

### 8. May 7, 2012 Last Minute Information Document

On April 20, 2012, the social worker, Mark Norris, telephoned the mother. Mr. Norris wanted to find out why the mother was running late even though he had left a previous voice mail message. On April 27, 2012, the mother called Mr. Norris to state that she had just awakened and was on her way to the visit. She was 1 hour and 15 minutes late. The mother also brought an unidentified person with her to the visit, who was denied access. The mother failed to appear for a scheduled visit on May 3, 2012.

### 9. Section 366.26 Report

On September 20, 2012, department social worker Becky S. Merriweather prepared the section 366.26 report. The child was three years old in foster care. He was reported to be on track developmentally and not a regional center client. On April 2, 2012, the child had a medical examination which showed he was diagnosed with anemia and given a prescription for treatment.

In June 2012, Ms. Merriweather observed a brown spot on one of the child's teeth and asked the foster mother to take him to the dentist. Additionally, the Department of

Mental Health staff assessed the child and found his speech was delayed. The Department of Mental Health's doctor told the foster mother that the child needed play therapy. The foster mother however did not keep an appointment for the therapy.

Ms. Merriweather noted concerns regarding the foster mother's willingness to follow through with needed services for the child. The child had been placed with the foster mother for the past seven months. The department noted the parents had very little to no contact with the child during this time period. The department noted the father had not visited the child. The agency received only one telephone voice mail message from the father in August 2012. The mother had monitored visits on April 20, July 27, August 16, and September 7, 2012.

Dr. LaNaadrian Easterling of the Department of Mental Health expressed concerns about the foster mother. According to Dr. Easterling, the foster mother did not return telephone calls and was uncooperative. Ms. Merriweather wrote: "Dr. Easterling also indicated that she believed that [the foster mother] was not expressing a willingness to follow through with the [d]epartment's recommendations or referral for services, stating something to the effect of, 'I can do what I think best for him once I adopt.' This was very troubling to Dr. Easterling who expressed concern about [the foster mother] being a permanent caregiver."

10. October 18, 2012 Last Minute Information Document

In its October 18, 2012, last minute information document, the department reported the child was referred to the Department of Mental Health for assessment. The therapist had concerns because the child referred to every female teacher at school as "mommy" and every male teacher as "daddy." The child called the foster mother "mommy" and the social worker "granny." On October 4, 2012, the social worker spoke with the foster mother regarding updates on the child's medical and dental appointments. The foster mother stated she had taken him to all the required appointments. The mother had not made herself available for a visit with the child since her last one.

## 11.  March 21, 2013 Section 366.26 Report

After a continuance, the department prepared a new section 366.26 report on March 21, 2013.  The social worker, Nadine DeRose, reported the child had a medical examination on October 17, 2012, and his results were within normal limits.  The child remained developmentally on track.

The child was moved from the foster mother's home into the prospective adoptive father's home because of a referral against her alleging neglect.  The referral alleged another child was removed because of the foster mother's medical neglect.  The mother's monitored visits with the child had been sporadic and she continued to cancel her scheduled visits.  On February 26, 2013, the mother came to a department office for a meeting.  The mother wanted the child placed back with the foster mother.  The mother claimed she had enrolled in programs in order to reunify with the child.  As of March 18, 2013, the mother failed to provide Ms. DeRose, the social worker, with proof of enrollment or completion of any programs.  The mother visited the child once on March 15, 2013.  The father made no contact with the department.  On March 7, 2013, the child was matched with the prospective adoptive father who was already pre-approved to adopt.  The pre-placement conference was scheduled for the week of March 18, 2013.

## 12.  June 20, 2013 Section 366.26 Report

Ms. Merriweather prepared a new section 366.26 report on June 20, 2013.  The child was placed in the prospective adoptive father's home on April 19, 2013.  Ms. Merriweather characterized it as a stable home and the child called the prospective adoptive father "daddy." According to Ms. Merriweather, the prospective adoptive father and the child had bonded.  The mother visited the child on March 15 and 29, April 5 and 26, May 18, and June 14, 2013.  The mother cancelled one visit because she had program events that would not allow her to attend.  The father did not visit the child.

11

The social worker reported the child was likely to be adopted by the prospective adoptive father. The department completed and approved the prospective adoptive father's home study on December 12, 2012. The prospective adoptive father owned his own home and resided there with his mother. The prospective adoptive father had bonded with the child. Likewise, the prospective adoptive father's mother had bonded with the child. The prospective adoptive father and his mother, who both work, took alternate work schedules. This was done to accommodate caring for the child. The prospective adoptive father welcomed and looked forward to nurturing and guiding the child. The prospective adoptive father had no children. But, he indicated his love for all children. The prospective adoptive father welcomed the opportunity to love and raise the child in a loving environment. The prospective adoptive father was committed to adopting the child and providing the youngster a permanent home.

On May 21, 2013, the child was examined at the Martin Luther King, Jr., medical clinic. There were reported developmental concerns so the child was referred for a comprehensive developmental assessment on June 28, 2013. The child's vision and hearing were rated "Abnormal: Uncooperative," but his hemoglobin and urine drip test results were normal.

13. Section 366.26 Hearing

On June 26, 2013, the section 366.26 hearing was held. The mother was called to testify on her own behalf. The mother stated she was supposed to visit the child twice a month. But she claimed she had not been "getting" her visits once the child was placed with the prospective adoptive father. The mother stated each visit was for an hour at the department's office. The mother admitted she had recently missed visits. The mother testified the social worker prevented the visits from occurring. When asked if she missed any visits because of her schedule, the mother testified it had not occurred recently. The mother testified she tried to go to all the visits scheduled for her. The mother stated she brought "toys, food, snacks, juices, bubbles, crayons, [and] coloring books" to the visits.

12

The mother stated when the child first saw her, he would run up to her, say "mommy," and hug her.  The mother testified she would pick the child up, hug him back, and tell him how much she loved him.  The mother said the child cried when the visits ended and claimed he did not want to leave.  When cross-examined, the mother testified any missed visits from September of 2012 to March 2013 were because of the social worker.  The mother denied cancelling any visits with the child.  The mother acknowledged the last time the child lived with her was when he was two years old.

## III.  DISCUSSION

### A.  Overview

Adoptability focuses on whether the child's age, physical condition and emotional state make it difficult to find a person willing to adopt the minor.  (*In re Zeth S.* (2003) 31 Cal.4th 396, 406; *In re Michael G.* (2012) 203 Cal.App.4th 580, 589.)  Our Supreme Court has stated, "All that is required is clear and convincing evidence of the likelihood that adoption will be realized within a reasonable time."  (*In re Zeth S., supra,* 31 Cal.4th at p. 406; *In re Gregory A.* (2005) 126 Cal.App.4th 1554, 1562.)  Section 366.26, subdivision (c)(1) stresses, "The fact that the child is not yet placed in a preadoptive home nor with a relative or foster family who is prepared to adopt the child, shall not constitute a basis for the court to conclude that it is not likely the child will be adopted." (See *In re D.M.* (2012) 205 Cal.App.4th 283, 294, fn. 3; *In re Gregory A., supra,* 126 Cal.App.4th at p. 1562.)  If a child is generally adoptable, we do not assess the suitability of the prospective adoptive home.  (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1526; *In re Carl R.* (2005) 128 Cal.App.4th 1051, 1061.)  But if a child is adoptable based solely on the willingness of a particular family to adopt him, the juvenile court must determine whether there is a legal impediment to adoption.  (*Ibid.*; see *In re G.M.* (2010) 181 Cal.App.4th 552, 562.)  A prospective adoptive parent's interest in adoption is evidence the child's age, physical condition, or mental state will not discourage others from doing

13

the same.  (*In re I.W., supra,* 180 Cal.App.4th at p. 1526; *In re Erik P.* (2002) 104 Cal.App.4th 395, 400.)  We review an adoptability finding for substantial evidence.  (*In re Michael G., supra,* 203 Cal.App.4th at p. 589; *In re Jose C.* (2010) 188 Cal.App.4th 147, 158.)

The mother argues there was insufficient evidence regarding adoptability because the child was emotionally unsettled and frequently throwing tantrums.  The mother contends the juvenile court should have waited for the result of the child's evaluation scheduled on June 28, 2013.  The father joins in the mother's argument.

Substantial evidence supports the adoptability finding for the child.  As noted, the department approved the prospective adoptive father's home study on December 12, 2012.  At the time of the section 366.26 hearing, the child was placed with the prospective adoptive father since April 19, 2013.  The child was four years old.  The prospective adoptive father was bonding with the child.  Also, the child was bonding with the prospective adoptive father's mother.  The prospective adoptive father owned his home and both he and his mother worked alternate schedules.  They did so to accommodate caring for the child.  The prospective adoptive father stated his love of children and his understanding that adoption was a life-long legal commitment.  The child was in a stable home and bonded with the prospective adoptive father.  The child called the prospective adoptive father "daddy."  Likewise, the child was bonded with the prospective adoptive father's mother.  At the time of the section 366.26 hearing, the child was referred for a comprehensive developmental assessment.  The child's developmental delays did not impede the prospective adoptive father from pursuing adoption.  The prospective adoptive father's willingness to adopt generally indicated the child was likely to be adopted within a reasonable time.  (*In re I.W., supra,* 180 Cal.App.4th at p. 1526; *In re Erik P., supra,* 104 Cal.App.4th at p. 400.)  Thus, there was substantial evidence that the child was likely to be adopted.

## IV. DISPOSITION

The order terminating the parents' parental rights is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


TURNER, P. J.


We concur:


KRIEGLER, J.


MINK, J.[*]

---

[*]     Retired Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.