Filed 2/5/14  In re Oscar D. CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re OSCAR D., a Person Coming Under the Juvenile Court Law. | B250432<br>(Los Angeles County<br>Super. Ct. No. CK89585) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>     Plaintiff and Respondent,<br><br>     v.<br><br>YASMINE G.,<br><br>     Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Jacqueline H. Lewis, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed.

Terence M. Chucas, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel and Kimberly A. Roura, Deputy County Counsel for Plaintiff and Respondent.

# I. INTRODUCTION

The mother, Yasmine G., appeals from an order terminating her parental rights to Oscar D. following a contested Welfare and Institutions Code[1] section 366.26 hearing. The mother argues the parent-child relationship exceptions to adoption apply. We reject these contentions and affirm the parental rights termination order.

# II. BACKGROUND

## A. Procedural Background

### 1. The petition

On September 6, 2011, the Los Angeles County Department of Children and Family Services (the department) filed a section 300, subdivisions (a) and (b) petition. The department acted on behalf of then three-year-old Albert V. and five-month-old Oscar D. Albert V. and Oscar D. share the same mother but have different fathers.

The section 300, subdivision (a) count alleges the following. The mother and O.D., Oscar D.'s father, had engaged in a violent confrontation on August 6, 2011. During that altercation, O.D. choked the mother and pushed her to the floor inflicting a bruise on her knee. O.D. pulled the mother's hair and struck her back with his fists. O.D. pushed the mother against a trash can. The mother bit O.D.'s arm, inflicting bite marks. The mother was arrested for spousal assault.

The section 300, subdivision (b) count alleges the following. The violence between the mother and O.D. endangered the physical and emotional health of the children. The mother had a history of drug abuse, including methamphetamine use and daily marijuana use. On August 11, 2011, the mother tested positive for marijuana. The

---

[1] All future code references are to the Welfare and Institutions Code unless otherwise noted.

mother had a filthy and unsanitary home for the children, with trash, molding food and dirty diapers throughout. O.D. had a history of drug use and was a current abuser of amphetamine, methamphetamine, and cocaine. O.D. tested positive for the above illicit drugs on August 24, 2011. O.D. had a prior criminal conviction for possession of controlled substance narcotics.

On September 6, 2011, the detention hearing was held. The juvenile court found a prima facie case to detain both children. It ordered temporary placement and custody of the children vested with the department. The children were placed with the maternal grandmother. The parents were granted monitored visitation.

On November 1, 2011, the department filed an amended petition on behalf of the children. A new count was added under section 300, subdivision (b). The new count alleged the mother and O.D. engaged in a violent altercation on October 6, 2011. O.D. held the mother against her will in the back room of his residence. O.D. swung a machete at the mother causing her to suffer multiple cuts to her hands which required stitches.

On January 10, 2012, a contested jurisdiction hearing was held. The juvenile court dismissed the section 300, subdivision (a) count in the interest of justice. It dismissed the section 300, subdivision (b) allegation for a filthy and unsanitary home. However, it sustained the remaining counts under section 300, subdivision (b).

On February 22, 2012, the dispositional hearing was held. The juvenile court found Oscar D. was a dependent child and removed custody from the mother. Oscar D. was ordered detained with his maternal grandmother pending the next hearing. The juvenile court provided the mother with family reunification services and monitored visitation. The mother would have to demonstrate an ability to meet Oscar D.'s physical and emotional needs and the ability to provide stable and appropriate housing before reunification would occur. Dispositional issues concerning Albert V. were continued. A.V. is Albert V.'s father. On June 14, 2012, the juvenile court placed Albert V. with A.V.

## 2. Review hearings

On October 3, 2012, the juvenile court found the mother had partially made progress towards alleviating the causes for foster placement care of Oscar D. The juvenile court ordered family reunification services for the mother terminated. Notice was not sufficient, so Oscar D.'s case was continued to November 8, 2012, and then to December 6, 2012.

On December 6, 2012, the juvenile court found the department provided O.D. with reasonable services and that he made minimal progress towards alleviating the causes for foster placement care. Reunification services with O.D. were terminated. The department was ordered to prepare an assessment report pursuant to section 366.26 for Oscar D. Oscar D.'s section 366.26 hearing was scheduled for April 3, 2013.

## 3. Modification petition

On December 17, 2012, the mother filed a section 388 petition. The mother requested the juvenile court modify its order granting her monitored visits with Oscar D. She requested her visits become liberalized and unmonitored. She alleged changed circumstances since the juvenile court made its monitored visitation order. She alleged compliance with her case plan. She alleged the foster family limited her visits with Oscar D. to one visit per week for two hours. The mother alleged unmonitored visits would be in Oscar D.'s best interest because she was very bonded to him. Unmonitored visits would allegedly allow the juvenile court to assess the mother's parenting skills and ability to have Oscar D. in her care and custody.

On December 17, 2012, the maternal grandmother filed her own section 388 petition. She requested Oscar D. be returned to her home. Oscar D. had been removed from her custody on December 6, 2012. The juvenile court denied the maternal grandmother's modification petition without a hearing. On February 27, 2013, the juvenile court denied the mother's section 388 petition after a contested hearing. The

juvenile court found the best interests of Oscar D. would not be served by placing him with the mother.  No appeals were taken from the denial of the two modification petitions.

### 4.  Termination of reunification services

At the contested six-month review hearing on October 3, 2012, the juvenile court terminated reunification services.  On October 6, 2012, the social worker told the maternal grandmother that the juvenile court had ordered the department to find a permanent home for Oscar D.  On December 4, 2012, Oscar D. was removed from his maternal grandmother's home and placed in foster care.  On December 6, 2012, the juvenile court set the matter for a section 366.26 selection and implementation hearing on April 3, 2013.  On December 19, 2012, Oscar D. was placed in the prospective adoptive home.  Oscar D. remained in the prospective adoptive home to the present.

### 5.  Parental rights termination hearing

On June 3, 2013, the parental rights termination hearing was held.  Previously, on May 17, 2013, the mother filed her second section 388 petition.  She argued that her visits with Oscar D. be liberalized to unmonitored visits with the goal of having overnight visits within two months.  The issue of the second modification hearing was resolved at the June 3, 2013 parental rights termination hearing.

At the contested section 366.26 hearing, the juvenile court found Oscar D. was adoptable.  The juvenile court found no satisfactory exceptions to adoption applied in the case.  The juvenile court terminated the mother and O.D.'s parental rights to Oscar D.  The juvenile court denied her section 388 petition without hearing on June 3, 2013.  The mother appeals from the June 3, 2013 parental rights termination order.  No issue has been raised on appeal concerning the summary denial of the mother's second modification petition.

## B. Factual Background

### 1. Detention report

The September 1, 2011 detention report reveals the following. On August 6, 2011, a referral regarding Oscar D. and Albert V. came to the department alleging physical and emotional abuse and general neglect. O.D. explained that at the time of the incident, he and the mother had plans to go shopping. O.D. stated the mother instead wanted to go smoke marijuana with her friends. O.D. said the mother smoked marijuana daily. O.D. confronted the mother about marks and bruises on Oscar D. O.D. believed the marks and bruises were inflicted because the mother did not properly supervise Oscar D. O.D. told the mother she was not going shopping as planned. O.D. said the mother became violent and started fighting with him. O.D. stated the mother punched and hit him. O.D. stated that the mother is good, but when she needs "'that thing,'" presumably illegal drugs, "'she loses her mind.'" O.D. admitted he had been in prison all his life but he was now an actor and was writing a book.

Oscar D. and Albert V. resided together in the mother's home from March 2011 until being taken into protective custody on August 31, 2011. During this time, Albert V. left the mother's home on weekends to visit his paternal grandparents. Albert V. was placed with his paternal grandparents following the mother's arrest on August 6 until the September 6, 2011 detention hearing. The maternal grandmother said the mother had to use marijuana for pain based on her prescription. The maternal grandmother said the mother took care of Oscar D. and fed him properly. According to the maternal grandmother: "'I have never seen her [lose] her patience with the baby. She is a good mom.'"

The mother was released from jail on August 11, 2011. Interviewed upon her release, the mother said on the day of the incident, she and O.D. had agreed to go buy clothes for Oscar D. The mother received a phone call from a friend. The friend was to give the mother a ride to purchase medical marijuana. The mother told O.D. she needed

6

to buy more marijuana and would return soon to go shopping. O.D. became upset and started arguing and accusing her of being unfaithful. O.D. told her she was not going. The mother ran to prevent any further injury. O.D. chased the mother, grabbed her and threw her against a trash can. O.D. pulled her hair and choked her and the mother bit his arm. O.D. threw the mother to the floor and punched her on the back. The mother had a large scrape on her knee.

The mother said O.D. called police officers he knew. According to the mother, the officer accepted O.D.'s side of the story. The mother was afraid to report what happened because she feared O.D. retaliating against her and her family. The mother said O.D. was a gang member. The trial court issued a restraining order against the mother, barring her from contact with O.D. or Oscar D. The mother stated she used marijuana after receiving a prescription for lower back and pelvic pain following Oscar D.'s birth. The mother reported the department had removed her children previously because of her methamphetamine abuse. She had a voluntary case with the department from June 2010 to March 2011, when Oscar D. was born. The mother completed parenting classes, drug counseling, and random drug testing as required by the voluntary case plan.

On August 24, 2011, O.D. tested positive for amphetamine, methamphetamine and cocaine. The social worker informed O.D. that Oscar D. would be detained. O.D. stated this was fine and Oscar D. was placed with the maternal grandmother. At the September 6, 2011 detention hearing, Oscar D. and Albert V. were placed in the maternal grandmother's home.

### 2. Sheriff's report

The sheriff's report from the August 6, 2011 incident indicated the Los Angeles County Sheriff's Department responded to a domestic violence call at the mother's home. The mother had slight redness and swelling to her right forehead and an abrasion to her right knee. The mother sarcastically stated she fell. During a search of the mother's purse, deputies found a clear plastic methamphetamine pipe. Based on O.D.'s statements

and injuries, the deputies arrested the mother for spousal abuse. The deputies observed the residence had a foul odor, with trash and old food on the floor throughout the house. The mother was also charged with narcotic paraphernalia possession and child endangerment.

### 3. Jurisdiction/disposition and interim review reports

On September 29, 2011, the department submitted a jurisdiction/disposition report. The mother changed her story about the fight with O.D. The mother now stated that she and O.D. were only pushing each other, not punching, and she cut her knee because she tripped on her shoe lace. The mother stated the pipe the sheriff's deputies discovered was not hers. The mother admitted, "'I was going to give it to a friend of mine.'" The mother believed she would benefit from domestic violence and anger management counseling.

The social worker wrote that on October 6, 2011, there was another incident between the mother and O.D. According to the mother, O.D. forced her back to his house and threatened to kill her. The mother alleged O.D. attempted to cut her with a machete and she sustained injuries to her hands. No arrests were made and no report was taken. O.D. stated she came to his house upset and already bleeding.

The maternal grandmother moved from her home with Oscar D. and Albert V. on October 12, 2011. On October 25, 2011, the social worker reported the maternal grandmother initially refused to make the children available to the social worker. This was because the maternal grandmother feared O.D. would harm her. The maternal grandmother eventually brought the children to a department office. There, the maternal grandmother was told the children were to be removed from her custody temporarily until she obtained an approved home. The children were placed in separate foster homes. On November 1, 2011, the juvenile court ordered them placed with the maternal grandmother pending the next hearing.

In the January 10, 2012 interim review report, the mother claimed enrollment in parenting, anger management, individual counseling, and drug and alcohol counseling at

8

an outreach program. The mother received reunification services, including: parenting education; anger management; a drug rehabilitation program; and random drug testing.

In the February 22, 2012 interim review report, the social worker reported the mother tested positive for marijuana on February 14, 2012. The mother falsely stated she received services from an agency, the Community Outreach Program. But the Community Outreach Program did not provide services but only made referrals. The mother missed an intake appointment on January 3, 2012 and did not reschedule. As a result of her criminal cases, the mother was placed on 36 months of probation and ordered to attend 12 alcoholics or narcotics anonymous meetings.

4. Reunification period

By August 2012, the social worker reported Oscar D. continued to reside with the maternal grandmother in a home not approved under the Adoption and Safe Families Act. (42 U.S.C. § 670 et seq.) The maternal grandmother, maternal aunt, and uncle had not timely returned the required paperwork in order to secure approval of the residence. The family had a criminal history. In June 2010, the department substantiated physical abuse by the maternal uncle against the mother. The social worker reported the maternal grandmother was evasive when questioned. Neither the maternal grandmother nor O.D. made themselves available for the social worker to contact.

A letter from U-Turn Alcohol and Drug Education Program reported that the mother entered drug treatment on May 7, 2012. The mother was required to attend two or three sessions per week with each session being 90 minutes long. The program's subjects included alcohol and drug use, domestic violence, anger management, relapse prevention, trigger identification, and personal responsibility. The counselors reported the mother was receptive to the program, though they would like her to become more active during group discussions. The mother was drug tested as part of the program. She tested positive for marijuana on May 7 and June 20, 2012 and negative for all drugs on July 27, 2012.

9

The mother did not appear as required for several department random drug tests, including February 27, March 27, May 12 and 23, June 7, July 24, and August 8, 2012. She tested positive for cannabinoids on March 13, May 23, and June 18 of 2012. The mother reported she visited Oscar D. twice a week. The maternal grandmother monitored the mother's visits, which occurred on the weekends because the children lived far away.

The department recommended the parents' reunification services be terminated. As of February 13, 2012, the mother was not visiting Oscar D. because of the restraining order. On March 28, 2012, the maternal grandmother, the mother, and children came to the department office. The mother reported the restraining order was dropped at her last criminal hearing and she was visiting both children. As of June 2012, the mother lived in Los Angeles and visited Albert V. on Fridays for six hours.

5. Post-reunification services reports

In a January 2013 interim review report, the social worker noted the mother's 2012 drug tests. She tested positive for marijuana on March 13, May 7 and 23, June 18 and 20, 2012. She tested negative on July 27, September 20, October 2, and November 26 of 2012. She did not appear on February 27, March 27, May 10, June 7, July 24, August 8, and October 10 and 22, 2012. After the mother's reunification services were terminated, she continued attending the drug treatment program, though inconsistently. The department recommended the mother continue to have monitored visits with Oscar D. twice a week for two hours. The mother was not enrolled between December 18, 2012, and January 16, 2013, allegedly because of insurance issues.

The February 2013 interim review report states the mother had a new apartment. The apartment was shared with the maternal grandmother. The lease was in the maternal aunt's name. This was because the mother had a prior eviction on her record. The mother could not provide a contact phone number for the manager. The mother worked as an independent salesperson for coffee bags.

The mother stated she visited Oscar D. for two hours twice per week. The mother and the maternal grandmother visited on February 7 and 14. The mother visited alone on February 8. During the February 15 and 21, 2013 visits, Oscar D. was very upset. On February 15, every time the mother or the maternal grandmother tried to pick up Oscar D., he would scream at the top of his lungs and hit them. After 10 minutes, the foster father telephoned the social worker to ask what to do. The social worker advised the foster father to walk Oscar D. out of the visit. It was hoped this would calm Oscar D. down. Oscar D. was not happy to return to the visit and it ended early. On February 21, when the mother and the maternal grandmother arrived, Oscar D. was again very upset like the last visit and it ended early.

The social worker found the mother had stable housing and the home was appropriate. The social worker expressed concerns including the mother failing to drug test consistently for the department. Further, the social worker was concerned because the mother had not completed all court-ordered services. The department recommended the mother be given monitored visits four times per week for two hours and undergo conjoint therapy. The social worker believed further liberalized visits would depend on the outcome of the recommended visits.

6. Section 366.26 report

When originally placed with the foster parents, Oscar D. would scream at nap and bedtime, throw his blankets and stuffed animals out of the crib, and sometimes undress himself. At the time of the section 366.26 report, Oscar D. rarely cried at bedtime and allowed himself to be tucked in. He learned to eat healthy food independently. The social worker noted the foster father implemented a daily structure that provided security and consistency, as well as structured learning during activities. Oscar D.'s preschool reported he had made dramatic improvement since being placed in foster care. The foster father reported Oscar D. had grown very attached to the prospective adoptive parent's five-year-old daughter. According to the foster father, Oscar D. was comfortable in the

adoptive home.  The foster father had an approved home study.  The social worker found the foster father was committed to providing Oscar D. with a loving and permanent home through adoption.  Oscar D.'s daycare was located at the foster father's place of employment.  The foster father would regularly see Oscar D. and often spent the lunch hour with the youngster.

The mother's visits with Oscar D. in March 2013 were reportedly smoother.  The social worker observed a visit on March 28, 2013.  The foster father would first sit with Oscar D. at a table.  The mother would sit at an adjacent table.  The mother would start talking to Oscar D.  After 10 to 15 minutes, Oscar D. felt comfortable enough to go to the mother without struggle.  The mother visited Oscar D. three or more times per week from September 6 to December 4, 2012, while he lived with his maternal grandmother.  After Oscar D. was moved to the foster parents' home in December 2012, the mother visited him for two hours twice per week.

The social worker noted Oscar D. was comfortable with his maternal grandmother.  However, there was no guarantee the maternal grandmother would cooperate with the department and be approved under the Adoption and Safe Families Act.  Oscar D. had become securely attached to the foster father.  Oscar D. looked to the foster father for guidance and comfort.

The social worker reported the mother and the maternal grandmother visited Oscar D. twice per week.  The visits seemed to be going well as Oscar D. became more comfortable with the mother.  The social worker noted that the maternal grandmother provided most of Oscar D.'s parenting during the visit.

The social worker concluded the mother did not have a secure recovery nor appeared ready to parent Oscar D.  The social worker found the mother's relationship with Oscar D. to be more like a sibling than a parent.  The social worker in the section 366.26 report noted a connection between Oscar D. and Albert V.  The social worker believed it would be ideal for the mother and the maternal grandmother to continue visiting and appropriate for Albert V. and Oscar D. to keep in touch.  The social worker recommended Oscar D. be adopted.

## 7. Section 366.26 hearing

The section 366.26 hearing was held on June 3, 2013. The mother testified at the contested 366.26 hearing that she had monitored visits with Oscar D. twice per week for two hours each visit. The mother testified Albert V. was sometimes present when the mother and the maternal grandmother visited Oscar D. The mother stated: "[U]sually, now he cries when he leaves. He cries that he doesn't want to leave from the visit." The mother described the reaction of Oscar D. upon seeing Albert V. thusly: "As soon as he sees Albert, . . . he's really happy. And he approaches him, and he just want[s] to be with Albert and plays around. He follows Albert everywhere." The mother stated the maternal grandmother was present at all visits.

The maternal grandmother confirmed she normally was present during the twice-weekly visits with Oscar D. at the park. When asked whether Oscar D. said anything when he saw the mother, the maternal grandmother stated: "No, no. Well, when we arrived, he's a little bit withdrawn, like he doesn't want to." Oscar D. eventually would come to the mother and call her, "Mommy." The maternal grandmother stated, "The child loves [the mother] very much, even though they haven't been together."

## III. DISCUSSION

### A. Overview

The mother does not dispute Oscar D. is adoptable. However, the mother contends the juvenile court erred by failing to apply the beneficial parenting or sibling relationship exceptions pursuant to section 366.26, subdivisions (c)(1)(B)(i) and (v), respectively. The juvenile court stated it could not find that Oscar D. had such a strong relationship with either the mother or Albert V. that it would outweigh the benefits of a stable and permanent home. The juvenile court stated: "I would note today that there was even discrepancy between the mother's statements as well as . . . the grandmother's

in regards to Oscar's relationship with his mother.  [¶]  Mother testified . . . from her perspective, that Oscar's thrilled to see her, calls or 'mommy.'  Everything is great.  Grandmother, who wasn't in here for that testimony, comes in and says, 'Well, he's hesitant to go up to her, but he eventually warms up.'"  The juvenile court further noted the mother had never made enough progress to achieve unmonitored visits.  The juvenile court terminated parental rights over Oscar D., ordered a permanent adoption plan, and designated the foster father as the prospective adoptive parent.  The mother appealed the order.

### B.  The Beneficial Parental Relationship Exception Is Not Applicable

Section 366.26, subdivision (c)(1) requires the juvenile court to terminate parental rights if the child is found likely to be adopted by clear and convincing evidence.  At a section 366.26 hearing, if the child is likely to be adopted, adoption is the preferred permanent plan.  (*In re Celine, R.* (2003) 31 Cal.4th 45, 53; *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1348.)  Certain exceptions exist.  The beneficial relationship exception applies when, "The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  (§ 366.26, subd. (c)(1)(B)(i).)  Our Fourth Appellate District colleagues have held:  "[W]e interpret the 'benefit from continuing the [parent/child] relationship' exception to mean the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.  In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer.  If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated."  (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575; see *In re K.P.* (2012) 203 Cal.App.4th 614, 621 [same].)  The parent has the burden of proving that termination

would be detrimental to the child under section 366.26, subdivision (c)(1)(A). (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947; *In re Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1350.) The court's factual findings are reviewed for substantial evidence. (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 576; see *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315 [applying substantial evidence standard to whether beneficial relationship exists and abuse of discretion standard to juvenile court's determination of relationship's importance].) The Court of Appeal has explained, "'Broad deference must be shown to the trial judge. The reviewing court should interfere only if [it] find[s] that under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he did.' [Citations.]" (*In re Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1351; see *In re K.P.*, *supra*, 203 Cal.App.4th at p. 621.)

The mother argues she maintained regular visitation with Oscar D. When Oscar D. resided with the maternal grandmother, the mother visited Oscar D. multiple times per week. However, from August 2011 to February 2012, she was unable to visit Oscar D. after his removal from her care because of a restraining order. Substantial evidence exists which indicated regular visitation did not occur for six months following Oscar D.'s removal from the mother's care.

The mother also contends her relationship with Oscar D. is beneficial. As noted, the mother's visits with Oscar D. in February 2013 after placement with the prospective adoptive family were not ideal. Oscar D. refused to go to the mother; throwing temper tantrums, screaming, and hurtling himself on the floor. In March 2013, a new system was used, in which the foster father and Oscar D. would sit at a table. The mother would sit at a nearby table. The mother would talk to Oscar D. until he felt comfortable to go to her, usually after 10 to 15 minutes. The grandmother testified that Oscar D. was hesitant to approach the mother at the start of visits. The mother always had monitored visits. The mother almost always had other relatives present at the visits, which reduced the amount of bonding time between the mother and Oscar. D. The social worker noted the maternal grandmother provided most of the parenting for Oscar D. in the past. The mother has not been alone with the child since August 6, 2011. Further, the mother who

15

is on probation for conduct involving domestic violence, is a narcotic abuser who regularly missed drug tests. There is no merit to the mother's argument she can benefit the child apart from her role as an occasional visitor. Substantial evidence supports the juvenile court's determination that the beneficial parental relationship exception does not apply. The benefits of the mother maintaining a relationship with Oscar D. did not outweigh his need for a full emotional commitment from a responsible caretaker. (See *In re Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1350 ["[A] child should not be deprived of an adoptive parent when the natural parent has maintained a relationship that may be beneficial to some degree but does not meet the child's need for a parent."]; accord, *In re Jason J.* (2009) 175 Cal.App.4th 922, 937.)

### C. The Sibling Relationship Exception Is Inapplicable

The mother also argues the sibling relationship exception applied. The sibling relationship exception applies when: "There would be substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption." (§ 366.26, subd. (c)(1)(B)(v); see *In re D.M.* (2012) 205 Cal.App.4th 283, 290.)

Our Supreme Court has explained the sibling relationship exception application as follows: "Reflecting the Legislature's preference for adoption when possible, the 'sibling relationship exception contains strong language creating a heavy burden for the party opposing adoption. It only applies when the juvenile court determines that there is a "compelling reason" for concluding that the termination of parental rights would be "detrimental" to the child due to "substantial interference" with a sibling relationship.' [Citation.] Indeed, even if adoption would interfere with a strong sibling relationship, the

16

court must nevertheless weigh the benefit to the child of continuing the sibling relationship against the benefit the child would receive by gaining a permanent home through adoption.  [Citation.]"  (*In re Celine R., supra,* 31 Cal.4th at p. 61; see *In re L.Y.L.*, *supra*, 101 Cal.App.4th at pp. 952-953.)  An appellate court has explained, "[T]he application of this exception will be rare, particularly when the proceedings concern young children whose needs for a competent, caring and stable parent are paramount." (*In re Valerie A.* (2007) 152 Cal.App.4th 987, 1014; accord, *In re L.Y.L.*, *supra*, 101 Cal.App.4th at p. 950.)  The party asserting the exception applies has the burden of producing evidence supporting that contention.  (*In re Celine R.*, *supra*, 31 Cal.4th at p. 61; *In re Bailey J.*, *supra*, 189 Cal.App.4th at p. 1314.)  We conduct a review for substantial evidence to support the juvenile court's conclusions.  (*In re D.M., supra,* 205 Cal.App.4th at p. 291; *In re K.P., supra,* 203 Cal.App.4th at pp. 621-622.)

Defendant contends severing Albert V.'s relationship with Oscar D. would be so detrimental, it would outweigh the benefits of adoption.  As noted, the children were generally raised in the same home from Oscar D.'s birth in March 2011 until June 14, 2012.  After June 14, 2012, Albert V. and Oscar D. would see each other only sporadically.   Close to a year passed from the date of Albert V.'s placement and Oscar D.'s section 366.26 hearing on June 3, 2013.  The evidence presented indicated Oscar D. enjoyed spending time with Albert V.  However, as noted in the section 366.26 hearing report, Oscar D. also enjoyed activities with his pre-adoptive sister.  Oscar D. and Albert V.'s relationship was not so significant that that it would outweigh a permanent stable home through adoption.  The juvenile court did not err in finding the sibling relationship exception did not apply.

## IV. DISPOSITION

The order terminating parental rights is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

TURNER, P. J.

We concur:

MOSK, J.

KRIEGLER, J.

18