Filed 1/27/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re M.V., a Person Coming Under the Juvenile Court Law. | B315297 |
| _____ | (Los Angeles County Super. Ct. No. 18CCJP07148A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| K.V., | |
| Defendant and Appellant. | |
| In re M.V., a Person Coming Under the Juvenile Court Law. | B317146 |
| _____ | (Los Angeles County Super. Ct. No. 18CCJP07148A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| K.V. et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, Pete R. Navarro, Juvenile Court Referee. Reversed and remanded.

Aida Aslanian, under appointment by the Court of Appeal, for Defendant and Appellant K.V.

Leslie A. Barry, under appointment by the Court of Appeal, for Defendant and Appellant David V.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Navid Nakhjavani, Deputy County Counsel, for Plaintiff and Respondent.

---

## INTRODUCTION

K.V. (Mother) and David V. (Father) appeal from the juvenile court's order terminating their parental rights to daughter M.V. They contend the court erred when it declined to order a supplemental bonding study and did not conduct a proper analysis of the beneficial parent-child relationship exception set forth in Welfare and Institutions Code[1] section 366.26, subdivision (c)(1)(B)(i), as required by *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*). We reverse the order terminating parental rights and remand the matter to the juvenile court.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

2

**FACTUAL AND PROCEDURAL BACKGROUND**

I.   *Commencement of Dependency Proceedings*

Four-year-old M.V. came to the attention of the Los Angeles County Department of Children and Family Services (DCFS) in November 2018 when law enforcement officers conducting a search at the family's home discovered thousands of pornographic images of children 1 to 13 years of age. Both parents admitted having child pornography on their phones and that some of the minors depicted could have been younger than 15 years old. Images of a child's vagina on Mother's cell phone were suspected to be images of M.V.

Mother said she exchanged nude photos of herself, engaged in sexual conversations for money, and role-played as a child while performing sexual acts. She admitted posting photographs of M.V. online for money. She had shared images of M.V. in the bathtub but denied sharing naked pictures of her. Mother had agreed to sell a video of M.V., and Father knew this, but she did not share the video because the purchaser did not pay.

DCFS filed a petition alleging M.V. came within the jurisdiction of the juvenile court under section 300, subdivisions (b)(1) (failure to protect) and (d) (sexual abuse). At the detention hearing on November 7, 2018, M.V. was detained from her parents and placed with her paternal grandparents.[2] The parents were granted monitored visits a minimum of twice per week for two hours each visit.

---

[2]   Mother, Father, and M.V. lived in the paternal grandparents' home, so M.V. remained at home while her parents moved out.

3

## II. *Events and Investigation Before the Jurisdictional Hearing*

### A. Interviews

Mother reported she was M.V.'s primary caregiver; she and Father both said she stayed home with M.V. while the other adults worked. However, M.V.'s paternal grandmother, Mary V., saw herself as M.V.'s de facto parent and her primary, if not exclusive, attachment figure: in her first conversation with DCFS, Mary V. said of M.V., "[T]echnically she is my baby." According to Mary V., she and the paternal grandfather had taken care of M.V. since she was born. She washed M.V.'s clothes, cooked for her, took her to the doctor, and enrolled her in school. She was willing to take custody of M.V., would take time off work to care for her, and would do anything to protect her.

Mary V. alleged Mother was "incapable of caring for" M.V., and there was no attachment or bond between them. Mother was a lazy parent who could not be trusted to take care of M.V. because "she feeds the child whatever is easier." The grandparents had tolerated Mother's presence in their home because she threatened to take M.V. with her if forced to leave. Mary V. also reported that two years earlier, M.V. bit Mother, and Mother, upset, bit her back.

Mary V. told DCFS in December 2018 that M.V. was adapting well under her care. The parents visited three times per week at a fast food restaurant. Visits were scheduled for two hours but usually lasted one hour and 40 minutes because M.V. could not always stay still that long. Mary V. reported visits went well and the parents engaged with M.V., although sometimes they used their phones during visits.

B.     <u>Multidisciplinary Assessment Team</u>

Mother and Mary V. presented diametrically opposed accounts when interviewed by a Multidisciplinary Assessment Team (MAT) in late 2018. Mother said that before M.V. was removed from her custody, M.V. had been happy; she smiled and played, rarely cried, and had few tantrums. She was active and energetic, and she had a healthy appetite and sleeping routine. She calmed easily or could be redirected if upset. But M.V.'s mood had changed since she was removed from their custody: she was now angry, irritable, distant, and easily upset. M.V. was not as happy as she had been when she lived with Mother and Father. At the end of visits, M.V. begged to go with her parents, screamed and cried for them, and refused to leave.

Mary V., on the other hand, said M.V. used to be irritable and upset, crying often and becoming frustrated when told she could not do something or when she had to go out with her parents. She preferred spending time at home with Mary V., and had often cried when her parents wanted to take her to outdoor activities. But now that Mary V. was caring for her full-time, M.V. was calmer, more easy to regulate, and in a better mood. M.V. "always" wanted Mary V.'s attention and her help with tasks. She followed Mary V. around, and some days, she needed physical contact with Mary V. all day to feel calm. M.V. was happy, and she did not become sad or cry when she saw or thought about her parents, although she sometimes cried at the end of visits.

Mary V. alleged Mother had physically abused M.V. and presented two photographs, one showing fingermarks on M.V.'s face and the other a bite mark on her elbow. Mother admitted having bitten M.V.

The MAT assessor found M.V. energetic and easily engaged. She made eye contact, easily approached the assessor, was talkative, and had a good sense of humor. She was able to initiate social interactions, reacted well to one-on-one interactions, and was not shy. M.V. enjoyed having the attention of the assessor and Mary V. She became dysregulated when not receiving attention. She was clingy with Mary V., climbing on her, pulling her hands and arms, grabbing and pulling her face toward her, and raising her voice whenever she did not have Mary V.'s full attention. M.V. followed Mary V.'s directions but disengaged whenever Mary V. stopped paying attention to her. However, she was easily redirected, was responsive to Mary V.'s attention, and responded to Mary V. with affection and attention of her own. M.V. and Mary V. had a strong bond.

M.V. needed to learn positive coping skills to regulate her feelings and "to develop a healthy bond/attachment with her caregivers, so she won't feel anxious when she is not close to" Mary V. The MAT team concluded she would benefit from mental health services because the sexual exploitation she endured could impact her future social interactions, self-esteem, and view of herself; it could create guilty feelings, confusion, anger, and difficulties regulating her emotions. She would need help developing skills to cope with the consequences of knowing her photographs were public and circulating online. As M.V. had been physically disciplined, she would need support to understand that physical aggression was not an appropriate way to express anger or frustration.

### III. *Jurisdictional and Dispositional Hearings*

At the jurisdictional hearing on January 16, 2019, the court sustained, as to both parents, the allegations under section 300, subdivisions (b) and (d) related to the sexual exploitation of M.V.[3]

At the court's direction, prior to the March 2019 dispositional hearing, DCFS asked Mary V. about a possible disposition of the matter through a legal guardianship pursuant to section 360, subdivision (a), but Mary V. was not interested in legal guardianship and wanted to adopt M.V.  On March 22, 2019, the court declared M.V. a dependent child, removed her from her parents, and ordered reunification services.  The court ordered monitored visits twice per week for three hours per visit, with a third visit if M.V.'s schedule allowed.

### IV. *March to September 2019*

In January 2019, M.V.'s pediatrician observed that M.V. displayed abnormal behavior and delays in meeting her developmental milestones.  M.V. had challenges with regulating her emotional responses and a short attention span.  She began therapy in February 2019, attending weekly sessions individually and with the paternal grandparents to manage prior traumatic experiences.

M.V. attended a Head Start program until August 2019; she "initially had challenges adjusting to the school setting as she would cry at the beginning of the day and not comply with nap

---

[3]    The court dismissed two additional section 300, subdivision (b) counts relating to Mother's substance abuse and mental and emotional problems.

times." Reports indicated M.V. had injured herself at school on multiple occasions.

In September 2019, DCFS reported M.V. had close relationships with both her parents and her grandparents. M.V. said she missed living with her parents. Both parents said M.V. asked them at visits to move back home, and Mother said M.V. cried at the end of visits. A social worker who monitored two visits reported the parents interacted appropriately with M.V. by playing games with her and feeding her. They appropriately redirected M.V. when she did not follow instructions. Mary V. had told DCFS the parents ended visits early, so DCFS asked them why; they explained M.V. had so much energy that it was difficult to contain her in a restaurant for two full hours. Mother occasionally brought toys to the visits but withheld them until M.V. behaved; Mary V. believed this made it more difficult for M.V. to focus on the visit because she was preoccupied with obtaining the toy.

Mother believed Father's family treated her unfairly. She had a contentious relationship with the paternal grandfather and several times asked DCFS to remove M.V. from the paternal grandparents' home. In June 2019 Mother said she did not care if M.V. was placed in foster care as long as she was away from the paternal grandparents.

A concurrent planning assessment identified adoption by the paternal grandparents as the permanent plan if reunification failed. At the September 2019 section 366.21, subdivision (e) review hearing, the court ordered continued reunification services and three 3-hour visits per week.

V.    ***October 2019 to January 2020***

In November 2019, then five-year-old M.V. completed individual therapy, having met the goals of decreasing tantrums and addressing her prior trauma. Mary V. reported M.V.'s behavior had changed, and she had new skills to help M.V. regulate her emotions.

The parents consistently visited M.V. three times per week. Mary V. reported visits were positive, M.V. required redirection during visits, and occasionally she cried and had difficulty leaving visits.

A DCFS social worker observed a November 2019 family visit at a fast food restaurant. M.V. was hyperactive, running from door to door and standing on the bench to the table. The parents and paternal grandparents instructed M.V. to stop and blocked the doors to prevent her from leaving the restaurant. M.V. cried when told no, and she refused to eat her food. Mother told M.V. that if she did not eat, she would not receive the surprise Mother had brought for her. M.V. began to cry. Mary V. told Mother that M.V. was likely not hungry; Mother then stopped prodding M.V. to eat and began to play with her. M.V. continually reached for Mother's bag in search of the surprise Mother had brought. Mother verbally redirected her firmly each time, and M.V. whined.

Mother gave M.V. the toy she had brought and helped her play with it. Soon M.V. said she wanted to order an ice cream dessert, stood up from the table, and ran for the kiosk. Mother yelled that she could not have the dessert and to return to the table. Father retrieved M.V., who whined. Mother brought M.V. to Mary V. and asked for her assistance. Mary V. and M.V.

stepped outside for several minutes; when they returned, M.V. was calm and holding onto Mary V.

On January 17, 2020, the court ordered continued reunification services.

VI.   *February 2020 to November 2020*

On February 10, 2020, the social worker visited M.V. and found her to be "a bit hyper." Mary V. said M.V. was usually calmer but acted up to get attention when visitors were present. Mary V. reported no behavioral problems and said M.V. behaved well at home and at preschool.

Mother and Father visited M.V. consistently prior to the pandemic. In early 2020 they began visiting separately. Mother claimed the separate visits caused M.V. "challenges" and said visits were difficult because M.V. was unhappy about Father's absence, but M.V. privately told the social worker she liked visiting with her parents and that she preferred they visit separately because "sometimes they fight over me."

Father visited M.V. for four hours each weekend day. During visits they read and played hide and seek. Father said M.V.'s behavior could be challenging when she did not get her way, but he redirected her and talked with her about what was right.

In February 2020, M.V. told DCFS, "I want to live with Mommy and Daddy." She said she did not really like living with her grandparents. When asked why, she said, "I miss my family." The social worker asked who her family was, and M.V. said her family was Mother, Father, the paternal uncle, and his

girlfriend.[4]  In March 2020, M.V. again told DCFS she liked visiting her parents.

When lockdown began, the parents visited M.V. telephonically.  Mary V. said in April 2020 that M.V. was fine and had neither requested in-person visits nor expressed concerns about not having in-person visits.  However, M.V. was sad once when Father did not answer the phone.  Mary V. had noticed M.V. becoming sad over things like losing a card game, and she did not want to be separated from Mary V. even for the short time it took her to get the laundry.

Mother proposed "car to car" visits as a safe way to resume in-person visits, and these visits began in April 2020.  Mother reported in late April that visits were going well but M.V. had cried during a visit because she wanted to go home with Mother.  In May 2020 Mother told DCFS that visits were difficult because M.V. wanted Mother to come live with her.

Father disliked the idea of car visits and chose telephonic visits, but he did not maintain regular phone contact with M.V.  In May 2020, M.V. told the social worker she saw her parents but she did not see her dad much; sometimes she spoke with him on the phone.  M.V. said, "I miss [D]addy, I haven't seen him or spoke to him a lot."  She shook her head yes when asked if she liked living with her grandparents.

During the social worker's May 2020 visit, M.V. "began crying and held on to [Mary V.] when she felt that [Mary V.] spoke to [the social worker] too long without her."  The social worker observed, "[M.V.] is hyperactive, and required

---

[4]     The uncle and his girlfriend lived with the paternal grandparents.

11

redirections from [Mary V.] and [the social worker] not to run to[o] far out of their sight, she pushes her boundaries when told not to do something." When the social worker visited the following month, M.V. cried hysterically because the social worker entered the house when she wanted the visit to be outside. M.V. went to Mary V. for comfort and was able to calm down, return to her seat, and continue eating food and playing on a tablet. Speaking privately with the social worker, M.V. said she liked living with her grandparents but missed her mom. She said, "I miss my mom living here, but I know she made bad choices when I was little, but I still miss her." M.V. said she missed Father.

In-person visits resumed by June 2020, although Mother was temporarily limited to video visits after being exposed to COVID-19. Mother told DCFS M.V. cried about not seeing Mother during their video chats.

The paternal grandfather told DCFS Mother's in-person visits never lasted the full allotted time; Mother often ended visits early because she needed to work, she was tired, or M.V. was misbehaving. Mother said she shortened her visits because they started at 6:00 p.m. and she did not want to keep M.V. out late, but she also cut short weekend visits despite their earlier start times.

DCFS asked Mary V. in May 2020 whether she believed unmonitored visits would be appropriate. Mary V. opposed unmonitored visitation, expressing concern that M.V. required a lot of attention for her safety but the parents were often distracted by their phones and/or gaming consoles during visits. Additionally, Mother's practice of bribing M.V. with gifts led to

M.V. becoming impatient and expecting gifts, which often resulted in tantrums.

In June 2020, Mary V. told DCFS her "biggest worry is that Mother will not allow the family to see [M.V.] again if she reunifies with her."

DCFS observed in June 2020 that both parents appeared to have a close bond with M.V. Mother visited consistently, participated in M.V.' s medical appointments when she could, and "constantly focused on [M.V.'s] wellbeing," inquiring about her during and after visits. The social worker had not observed Mother being distracted by her phone or gaming console during visits with M.V. as Mary V. had reported; however, Mother was frequently distracted by her electronic devices when she met with the social worker. DCFS reported that Mary V. felt Father was not always attentive to M.V.'s needs during visits and instead relied on Mother or Mary V. to take care of M.V. The parents' distraction was of concern because M.V. required constant supervision for her safety.

As of the summer of 2020, M.V. reportedly continued to manage her mental health and emotional stress well. She occasionally had tantrums and demanded a lot of attention, but the grandparents were able to manage her behaviors and refused additional mental health or support services.

On July 30, 2020, the social worker spoke with M.V. and Mary V. When the social worker mentioned that M.V. would soon have a visit with Mother, M.V. began to cry. She said she was not having a visit with Mother and she wanted her visit with Mother. Mary V. explained the visit had been changed to a video visit. Mary V. reported the parents continued to visit M.V. and that Mother's visits tended to last one to two hours. Mary V. said

13

Mother recently had expressed concern that M.V. wanted to know why Mother had bitten her and asked why she had done that "because [it meant] she can't live with her anymore."

As of August 2020, DCFS reported M.V. was "observed to have a close bond with her paternal family and has expressed that she loves and misses her parents on occasion." M.V. often cried when she did not get her way, but she was able to calm herself with adult assistance.

In September 2020, Mary V. wrote to the court urging it to allow the paternal grandparents to adopt M.V. as they had sought to do since the proceedings began. Mary V. stated she did not excuse Father for what happened and hoped he would continue to seek help, then described Mother as having the traits "of a narcissistic sociopath." "Not even a mother on drugs" would behave as Mother had, she wrote. Mother "knowingly and willingly put [M.V.] at risk, danger and easily betrayed and gave away this child's innocence." Mary V. had no doubt Mother would have put M.V. at greater risk had she not been caught. Mother lied and deceived others, and Mary V. feared she would again jeopardize M.V.'s well-being for her own gratification: "Simply put, I don't trust her."

The paternal uncle wrote to the court that removing M.V. from her grandparents "would be absurd and [would] damage [her] currently and down the line." He stated M.V. had always had an extremely close bond with her grandparents, particularly Mary V. She learned to crawl following Mary V. around the house. Her first steps were to Mary V. M.V. started calling Mary V. "Mommy-Nana" at a very young age and saw her not only as a grandmother but also as a maternal figure. M.V. could

not tolerate being apart from Mary V. and became "very emotionally upset" if Mary V. went to the store without her.

On November 9, 2020, after a contested 18-month review hearing, the court terminated reunification services and set the section 366.26 permanency planning hearing (.26 hearing) for March 10, 2021.

## VII.  *Crespo Appointment and Report*

When the court terminated reunification services, it remarked, "[T]he child certainly misses her father.  Those are her words."  At the parents' request, the court ordered a bonding study.  The court appointed Alfredo Crespo, Ph.D., to examine Mother, Father, and M.V. (then six years old), and to report on the "[r]elationship between Mother and Father and child[] concerning their bond and the potential emotional effects on the child if the relationship were permanently severed."

Crespo filed his report on January 21, 2021.  The parents' attorneys advised the court on March 10, 2021, that Crespo's evaluation and report were inadequate and asked for a supplemental report that addressed the impact on M.V. if the parental relationship were severed.  The court refused, saying the parties could argue the adequacy of the report at the hearing. The court continued the .26 hearing until June 2021 due to outstanding issues relating to the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.) (ICWA).

## VIII.  *February to October 2021*

M.V. had a close relationship with her grandparents and "appear[ed] happy, healthy, and thriving in the current home. [M.V.] appear[ed] to have adjusted well to the home and it is evident that she is bonded to her caregivers."

15

The parents continued to visit M.V. consistently. Mother was scheduled to visit seven hours per week in a public setting but sometimes requested telephone or video visits because of weather, darkness, or park closures. Visits sometimes ended early, but Mother engaged well with M.V. and no concerns had been reported. Father continued to visit M.V. at the grandparents' home three times per week, for three hours at a time, and his visits sometimes extended past the three-hour mark. DCFS said it was reported that Father stayed for the entire visit, but occasionally needed to be encouraged to engage in quality activities with M.V. rather than just allow her to play with his phone.

The paternal grandparents continued to express a desire to adopt M.V. and said they were open to continued contact with M.V.'s birth family as long as it was in her best interest. However, they disapproved of Mother's practice of giving M.V. gifts conditioned upon good behavior, believing M.V. had come to expect gifts at visits and was distracted by the prospect of the surprise. If M.V. searched for the promised item, Mother became upset and withheld the gift, disappointing and upsetting M.V. They also reported Mother counterproductively threatened to spank M.V. when she misbehaved. The paternal grandparents said that although they intended to "foster the relationship" M.V. had with her parents, "they may consider reducing the frequency of the mother's visitations if she continues to not recognize the effect her actions are having on the quality of visitations and [M.V.'s] emotional well-being."

In April 2021, DCFS reported M.V. missed her parents and occasionally asked why they could not live with her. In May, the paternal grandparents wrote to the court asking again to adopt

her.  They said the parents' attorneys wanted to "win" for their clients, but they were "not looking to win . . . we want to save [M.V.]."

In October 2021, M.V., now seven years old, told the social worker she liked seeing Father.  When asked about the activities she and Father did, M.V. said they played an online game together and talked about cats and a movie.  Father said they played video games and swam; M.V. also played with her hoverboard and put makeup on Father.  According to the paternal grandparents, however, Father fell asleep during nearly every visit; they showed DCFS photographs of him sleeping on a couch next to M.V.  They said when Father was awake, visits often consisted of him giving M.V. his phone and sitting with her.  Mary V. said Father participated in activities with M.V., but M.V. often had to "beg" first.  In fact, Mary V. said, M.V. would come to Mary V. to have her tell Father that M.V. wanted to go outside or engage in a particular activity.

Mary V. reported that during Mother's visits, M.V. played video games and a phone, ate fast food, and roller skated.  Mary V. said Mother canceled an average of two visits per month; she had canceled several visits in August but canceled less frequently thereafter.  Mary V. said M.V. had expressed she was accustomed to Mother sometimes canceling visits.

IX.    *Termination of Parental Rights*

The .26 hearing took place on November 23, 2021.  Father, Mother, and Mary V. testified, and stipulated testimony was received from M.V.

A.    Father's Testimony

Father testified about his visits and his relationship with M.V.  He visited her at his parents' home three times per week for three hours per visit.  On Friday evenings he brought dinner, and they watched television while they ate.  After dinner, they played video games or did puzzles.  At the end of the visits, M.V. changed into her pajamas and he gave her a ride on his back to the grandparents' room.

On Saturdays, they played games and went over any schoolwork M.V. had.  Father read to her.  Sometimes they went out to dinner with the paternal grandparents.  Saturday visits "conclude[d] with the wolf man story, . . . a story I just kind of spitball together of . . . her and I going on adventures together." When saying goodbye, Father said, "I give her a hug and we do our handshake.  We have three different handshakes that we do together.  I give her a hug and she gives me a kiss on the cheek and I let her know that I'll see her . . . the next day.  And she'll give me a kiss on the cheek and she'll say, I love you, Daddy.  I'll see you tomorrow."

Father and M.V. talked and played games on Sundays. M.V. practiced math and reading with educational games on Father's phone.  M.V. typically sat with Father unless she wanted to show something to Mary V.  At the end of the visits, M.V. rode on his back to go lie down.

Father admitted dozing off during one visit.  He was "very, very patient" with M.V. and did not raise his voice with her.  He could tell when M.V. was testing her boundaries and limits and remained calm when she acted out: "I try to sit there and just talk to her and reason with her.  I let her know, you know, her actions do have consequences.  And I try to let her know, hey,

there's a reason your daddy is telling you don't do this, it's because I don't want you to get hurt along the way or, you know, just any action that may be detrimental." Father praised M.V. when she listened, did a good job, or was excited about reading, puzzles, or building with blocks. He said, "I always make sure that I praise her and give her a high-five. Try to be as positive as possible with her."

When M.V. knew Father had a day off work for a holiday or other reason, "she always says, hey, Dad, you need to be here tomorrow because I know you're not working." Father spent holidays with M.V. at the paternal grandparents' home, although he had not spent the previous Christmas with them because they had COVID-19. Instead, M.V. left cookies outside, and he dressed up as Santa Claus and appeared in the front yard.

During the week, Father talked to M.V. on the phone on Tuesdays and Thursdays while she visited with Mother, although the calls were short so as not to impact M.V.'s time with Mother. He had not been to M.V.'s school. Father did not give his parents money for M.V.'s care, but he bought items she needed. He had spent approximately $200 on clothes and shoes for M.V. at the start of the school year.

Father described his relationship with the paternal grandparents as "probably strained."

### B.     Mother's Testimony

Mother visited M.V. on Tuesday nights, Thursday nights, and Sunday mornings. Visits were scheduled for three hours, but Mother tended to end the evening visits after about an hour and a half because it was late.

Visits took place in Mother's car because Mary V. would not allow Mother in her home and refused to permit visits at the

office of Mother's transitional housing. Mother brought meals to visits. She and M.V. played video games or with kinetic sand. Mother asked M.V. about school, her day, and her visits with Father. When they discussed school, M.V. would tell Mother either that school was good or that they had done nothing that day.

The visits went well, but they were limited because it was difficult to do much in a car. It would be better if visits were in a setting where Mother could cook for M.V., sit at a table and eat, or watch television with her.

M.V. referred to Mother as "Mom" 90 percent of the time, but sometimes she called Mary V. "Mommy." Mother had not attended M.V.'s doctor's appointments or individualized education plan (IEP) meetings because Mary V. would not tell her when they were.

C.     Mary V.'s Testimony

Mary V. testified Father's visits with M.V. were good and M.V. was happy to see him. Usually they watched television or played video games, or M.V. played with Father's phone. Occasionally Father took her outside but they were usually in the house. Father nodded off and dozed throughout most visits, typically for a few minutes at a time. At the end of Father's visits, M.V. was, for the most part, "okay. She tells him good-bye without an issue. A few occasions she will get . . . a little upset" because Father was leaving.

Now and then Father purchased food for M.V., but generally Mary V. and paternal grandfather provided the meals. On Fridays Father called before coming over to ask if he should bring food for M.V. or if Mary V. had already taken care of the

meal. On Saturdays and Sundays, the paternal grandparents usually made or bought dinner.

Father spent holidays with M.V. He inquired about M.V.'s IEP meetings but never attended one, nor had he attended any of her medical appointments. Father had not planned M.V.'s birthday celebrations on his own initiative since she was removed from his care, and he had not provided anything for her besides a few outfits now and then and the occasional toy or ice cream.

Mary V. described the paternal grandparents' relationship with Father as "a little bit strained." The relationship had changed because of the "whole situation that we're in. Probably the lack of communication and the lies throughout."

D.    M.V.'s Stipulated Testimony

The parties stipulated that if called as a witness, M.V. would testify that she wanted to live together in one house with both her parents and her paternal grandparents; if she had to choose between them, she would choose to live with her grandparents until they died, and then with her parents; if she fell down and was hurt and only Mary V. and Mother were in the room, she would go to Mary V. for help; if she fell down and was hurt and only the paternal grandfather and Father were in the room, she would seek help from her grandfather; she did not like Mother sometimes because she remembered Mother smacks her; and she would be sad if she never got to visit with Mother and Father.

E.    Argument and Submission

In argument, Mother contended that the beneficial parental relationship exception applied: she had visited M.V. consistently, they had "a clear relationship," M.V. wanted to live

with her parents and grandparents, and she would be sad if she did not see her parents again. Mother argued the paternal grandparents were biased and seeking to adopt M.V. Mother requested a legal guardianship rather than adoption.

Father argued he had established the elements of the beneficial parental relationship exception. He visited regularly and consistently. M.V. was seven years old and she had expressed the desire to see her parents and to spend time with them. M.V. loved her parents, wanted to live with them, and would be sad if her visits with her parents ended. Father contended a legal guardianship would allow the maintenance of "[the] family ties that this child very much wants to continue to have."

Father argued Crespo's assessment "was not conducted in a way to provide meaningful feedback on the parent/child bond to this court" and was "very limited." Crespo did not meet any of the family in person, only observed a few minutes of visits by videoconference, and spoke with M.V. with Mary V. either present or within earshot.

Father contended that while Crespo advocated for an open adoption, apparently anticipating postadoption contact between the parents and M.V., that was not an option for the court to consider: when determining whether to sever parental rights, the court was required to proceed on the premise that if M.V. were adopted she would not see her parents again. Father argued Crespo's claim that open adoption would prevent M.V. from being vulnerable to some undescribed negative consequences to which adopted children are vulnerable indicated that Crespo believed that if M.V. were to lose all contact with her parents she could be vulnerable to these negative consequences. Even though Crespo

viewed the parents negatively, he understood that M.V.'s relationship with her parents, whom she loved and wanted to live with, was important.

Counsel for M.V. and DCFS argued parental rights should be terminated. M.V.'s attorney argued there was no indication the paternal grandparents would preclude parental visits, stating, "I think that their love [for] their granddaughter is so great, that they would not simply cut off the Father's visits or the Mother's visits."

The court found it "a little troubling" that Crespo did not perform an in-person assessment; the court was "struggling" with that. The court said, "We're [here] about what impact, if any, if the bond is severed is that going to have on this child. We can't ignore that. That's what this whole proceeding was about, weighing the impact versus the notion of permanency." The court took the matter under submission.

### F.    Ruling

On December 9, 2021, the court found M.V. adoptable by clear and convincing evidence. The court said, "[T]here's really not a question as to whether or not there's a bond. There clearly is a bond with the child and particularly the father, it appears."

The real question, the court said, was whether M.V. would benefit from continuing the relationship to such a degree that terminating parental rights would be detrimental to her. The court "gave much weight to Dr. Crespo's analysis" and described Crespo's view that "legal guardianship may create a false hope for the parents to eventually regain custody of the minor and, hence, introduce uncertainty and/or conflict among the parents and the paternal relatives[,] thereby creating a risk of more

23

emotional problems in the child that would otherwise be avoided through adoption." The court said it "embraces that sentiment."

The court continued, "[I]t's a question of what is paramount, the protection of the child or the—that is the paramount issue. The evidence is such that in this court's mind, it does not rise to the level of the parent—that the child would suffer detriment if the parent/child relationship was continued [*sic*]."

The court was impressed with Mary V.'s testimony and did not find her to be an "overbearing grandparent who simply wanted to substitute in as a parent just because of some emotional need [on] her part." The court said, "This child needs permanence. That's the mandate. I'm going to trust that the grandparents are acting in the best interest of their child, that they recognize that adopted children always wonder who their birth parents are. And we—it's quite common, [especially] now with DNA testing, that adopted children will track down their birth parents and attempt to develop a relationship. [¶] But the court has to do what's in the best interest of this small child, not what's in the best interest of the parents, and that's what makes this call an easy call. [¶] So, therefore, the court finds that it would be detrimental to the child to be returned to the parents. The court finds no exceptions to adoption apply."

The court terminated parental rights. Mother and Father appeal.

## DISCUSSION

### I. *Bonding Study*

Crespo was appointed to evaluate the relationship between Mother, Father and M.V., and the potential emotional effects on M.V. if the relationship were permanently severed. The parents

24

contend the court erred when it failed to order a supplemental bonding study after receiving a nonresponsive evaluation. We agree.

### A. Crespo's Report

Crespo performed "Psychological Evaluations" on Mother and Father that consisted of "proctored, remote-site self-administration of psychological instruments before virtual interviews were completed before the mother [and] father underwent direct clinical interviewing on January 8 and January 11, 2021, respectively." He had also reviewed documents pertaining to the dependency proceedings.

#### 1. *"Psychological Evaluation" of M.V.*

Crespo's psychological evaluation of M.V. consisted of a recitation of his interview of Mary V., followed by a description of two parent visits Crespo had participated in.

##### a. Interview of Mary V.

Crespo's interview of Mary V. primarily concerned Mary V. and the parents; very little of the interview concerned M.V.'s attachment to her parents or the effect upon her of a loss of her parental relationships.

Mary V. said she had been M.V.'s primary attachment for years. She knew M.V. was "mostly attached" to her because even before the dependency proceedings began, M.V. looked to Mary V. to get her needs met. Mary V. said "every time" she left the house, "even if the parents were there . . . [M.V] would be screaming and pounding the door and didn't want me to leave." This pattern of attachment continued to the present. M.V. had

an attachment to her mother and loved her, but when they all lived together Mother did not give M.V. the attention she desired.

Mary V. said M.V. was " 'doing very well' " in the grandparents' home. Mary V. wanted to adopt M.V. and felt it would be best for M.V. to remain with her and her husband. M.V. would have stability and love, and they always met her needs. Mary V. responded affirmatively when asked if her goal was to prevent M.V. from returning to her parents.

When Crespo explained the difference between legal guardianship and open or closed adoption, Mary V. said she and her husband wanted to adopt M.V. At first she said she probably preferred a closed adoption, but then said she would choose open adoption as she would never keep M.V. from her parents. Mary V. reported the paternal grandfather wanted an open adoption.

According to Mary V., Mother "had a bad soul" and was a "chronic liar" who "has to embellish every story." Mary V. did not trust Mother and did not think M.V. would be safe with her. Mary V. had not known of Mother's "on-line prostitution" but believed Father had. Mary V. believed Mother sold inappropriate photos of M.V. She had admitted selling nude photos of other children online and confirmed she had possessed child pornography. Father was not aware of it until after the fact.

Mary V. did not understand why the parents remained connected: Father's hands were not "totally clean," but Mother "has some type of hold on him." Father needed to resolve his personal issues. Mary V. believed M.V. would be safe with Father because he paid attention to her, but there was a risk he would expose her to Mother because he had no boundaries with Mother.

b.     Parent Visits

The remainder of the psychological evaluation of M.V. was a description of Crespo's involvement during a visit between M.V. and each parent.  Mary V. held her phone during the visits while Crespo participated by video call.

Crespo saw M.V. and Father eating breakfast.  Mary V. introduced Crespo to M.V. as someone working for the judge. Crespo asked to speak with M.V. privately, and M.V. was placed in the dining room.  M.V. said she lived with "[M]ommy-nana and Papa," who was not her father.  Her "real papa" was Father, but she had to call him "Papa" rather than his first name.

This was apparently Crespo's entire private interaction with M.V., because M.V. returned to Mary V.  Then, M.V. said she lived with Mary V. because " 'my mommy bit me, and I lived with my daddy, well not [just] my daddy, but my daddy didn't stop my mommy from doing bad things . . . she was biting me . . . .' "  M.V. confirmed she wanted to live with her grandparents and continue visiting her parents.  M.V. would not sit still, and Crespo ended his observation.

The following day, Crespo appeared by video call while Mary V. monitored M.V.'s outdoor visit with Mother.  Mother sat on a blanket and gave M.V. breakfast.  When Crespo greeted M.V., she climbed behind Mother to hide from the camera. Crespo suggested M.V. tell Mother about the previous day's visit. Mother, noticing M.V. was hiding, rubbed her back and told her it was okay.

M.V. refused to speak about the visit with Father.  She turned her back to the camera and spoke quietly, telling Mother she had told Crespo about the bad things Mother was doing.  She would not say anything further.  Mother reported to Crespo that

M.V. had whispered to her that she had brought up the time Mother bit her and Father did not do anything about it, "and that's why she is not with us." Crespo, forgetting that M.V. had told him this the day before, told Mother to tell M.V. he did not recall this statement.[5] M.V. said Crespo did not remember because she did not want Father to hear it.

Crespo asked Mother to ask M.V. if there was anything she wanted to discuss while Crespo was on the video call. M.V. asked Mother if she had done anything else. Mother encouraged M.V. to speak, and M.V. said, "[Y]ou were on the phone."[6] Mother "asked [M.V.] to say, 'what else I did,' to which [M.V.] shook her head."

When Mother tried to step away to speak with Crespo, M.V. resisted, became clingy, and cried. Crespo and Mother spoke briefly about M.V.'s reports. Mother told Crespo that M.V. was at the moment "drying her eyes because she doesn't like to be taken away from me," and she returned to M.V. M.V. hid behind Mary V., then walked over to the blanket where Mother had sat down. This concluded Crespo's observations.

---

[5] Crespo later acknowledged in his report that he had "a memory lapse" and that M.V. had in fact told him the day before that Mother had bitten her, but at the time he questioned both Mother and Mary V. about what he considered M.V.'s "misreport of her conversation" with him.

[6] Mary V. told Crespo that M.V. had in the past stated that Mother was "on the phone" because on the day of the raid M.V. was shown a photograph of a child's private parts and identified the photograph as depicting her.

## 2. *Psychological Evaluations of the Parents*

The majority of Crespo's report concerned his observations and psychological evaluations of the parents. He described the parents' physical appearances, calling Mother "moderately obese" and Father "chubby" with crooked teeth. He assessed their intellectual functioning. He performed psychological testing on them, directing them to complete a personality inventory, a child abuse potential inventory, and a life history questionnaire; and then he reported results from those testing and the disorders or traits with which those results were related. He took an extensive personal history from each parent. With respect to Mother, Crespo reported on abuse Mother suffered as a child, her relationship with her parents, her education, her weight, her sexual history, her relationship with and marriage to Father, and her history of suicidal ideation and attempts. He inquired into the events that led to the dependency proceedings and from there further delved into Mother's sexual preferences, specifically following up by asking Mother to tell him more about her preference for a particular sexual practice. There is no indication that he spoke with Mother about M.V.'s attachment to her or their relationship.

With respect to Father, Crespo reported on his affect, his childhood, his family unit, his education, his use of drugs, when he began to masturbate, the pornography he viewed as a teenager, when he became sexually active, his relationship with Mother and how it changed after M.V.'s birth, and who cared for M.V. before the dependency proceedings began. Crespo inquired about the events that led to the dependency proceedings, and then asked Father for information about the parents' sexual practices and partners and their open marriage. There is no

29

indication that Crespo questioned Father about the nature or significance of M.V.'s relationship with either parent. He did, however, want to know whether Father thought adoption or legal guardianship would be better.

3. *Evaluations, Opinions, and Recommendations*

In Crespo's evaluations, opinions, and recommendations, he included one sentence concerning M.V.'s attachment to her parents: he said his observation of the visits "suggested that the minor has some attachment to her mother, and that at the very least, feels comfortable in their presence." "However," Crespo then wrote, "the minor's history as reported by her paternal grandmother and the father, is such that she was mainly in the care of paternal relatives and may be most attached to her grandmother."

Crespo's remaining five paragraphs of opinions did not pertain to the importance to M.V. of her relationships with her parents or the consequences for her if the relationships were severed. Instead, he opined that returning M.V. to Mother's care "may pose a risk" to her; Father posed less risk to M.V. because he admitted his difficulty separating from Mother despite his awareness of her conduct; and Mother's psychological problems were so chronic that "it is unlikely that significant changes in her associated chronic poor judgment" would occur in the near future.

Crespo advocated for adoption by the paternal grandparents, contending it would be in M.V.'s best interest in light of the following considerations: Mary V. had been M.V.'s "primary attachment figure since before the incipience of [the] instant matter"; Mary V. was protective of M.V.; the "salacious nature of the allegations that brought the minor to the court attention"; the fact that M.V.'s attachment to the grandmother

30

had "likely intensified" over the past two years; the parents were unable to provide for her (neither had an adequate home); and the parents did not take responsibility for their actions.

Crespo opined adoption would "essentially keep[] [M.V.'s] relationship to her parents in place" in a safe manner and would prevent her from losing her parents, because the grandparents were willing to have an open adoption. In Crespo's view, a legal guardianship could raise false hopes of reunification with the parents that would introduce uncertainty and/or conflict between the parents and the paternal relatives; this would create "a risk of more emotional problems in the minor that would otherwise be avoided through adoption by the grandparents."

### B. Father's Counsel's Request for Supplemental Report

On March 10, 2021, the date originally set for the .26 hearing, Father's counsel advised the court that Crespo's report "didn't do a few things that we had asked of it." Counsel pointed out Crespo had said he was going to do the assessment in person, but he did not. Additionally, Crespo had "observed a few minutes only of virtually [*sic*] a visit between the parents and the child." Counsel asked for a supplemental report or that Crespo "actually observe, socially-distance[d], a visit between the parents and the children [*sic*]."

Father's counsel noted Crespo believed an adoption would be open and the grandparents would not cut off M.V.'s contact with the parents. This, she argued, "was not requested to be part of the assessment and it's not a valid point to consider in the [Evidence Code section 730 evaluation (730)] or in the .26 hearing given [that] legally you can't consider a promise that a caretaker is making to keep contact." Counsel concluded, "So I would ask Dr. Crespo address what we requested, which was what would

31

the impact be on [M.V.] if the parental relationship was completely severed and that he actually do in-person observations of visits because based on my review of the 730, a phone was h[e]ld up for him to watch briefly for a few minutes of an interaction between the parents and the child, which to me is not a sufficient bonding study." Mother joined in Father's request.

The court agreed face-to-face observation was ideal, but said it would not dictate to Crespo how to do his analysis. The court continued, "Just because we don't agree with the outcome of a 730 doesn't mean that we have—should have her re-evaluated. Whatever deficiencies that may be in the 730 can be argued. And so I'm not going to order that we send it back to Dr. Crespo."

### C. Analysis

Bonding studies supply expert opinion about the psychological importance to the child of the relationship with his or her parent(s) to assist the court in determining whether "the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i); see *Caden C.*, *supra*, 11 Cal.5th at pp. 632–633.) They are particularly informative in cases like *Caden C.*, in which the child was eight or nine years old and had a complex parental relationship with both positive and negative aspects. (*Caden C.*, at pp. 626–627, 634–635.) While "[t]here is no requirement in statutory or case law that a court must secure a bonding study as a condition precedent to" terminating parental rights (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1339 (*Lorenzo C.*)), the California Supreme Court has instructed juvenile courts to "seriously consider, where requested and appropriate, allowing for a bonding study or other relevant expert testimony." (*Caden C.*, at p. 633, fn. 4.)

As the juvenile court implicitly recognized when it ordered the study, this is exactly the kind of case in which a bonding study is valuable. M.V. was seven years old when parental rights were terminated. Although she had been out of her parents' custody for several years, both parents remained significantly involved in her life and she had maintained relationships with them: M.V. saw each parent three times per week; Mother's visits tended to run an hour to hour and a half each, while Father spent nine or more hours with her every week. There were many indications in the record that M.V. was bonded with her parents, loved them, missed them, and wished to maintain her relationship with them: she repeatedly expressed a desire to live with them and to continue her relationship with them. M.V. was upset and sometimes cried when she was unable to visit with them in person. There was evidence she experienced distress when separating from her parents and questioned why they could not live together. M.V. also appeared to have experienced ongoing emotional difficulties concerning separation, healthy bonding and attachment, and she had required mental health services to address her trauma and regulation of her emotional responses, indicating she may have particular emotional needs that inform the psychological importance of the parental relationships to her.

Additionally, this was not a case where the significance, or lack of significance, of the child's relationship with the parents was clear from the record. Although DCFS regularly reported M.V.'s statements about her parents and observed that she and her parents were bonded, there was not a great deal of independently obtained information in the reports about the quality of her interactions with them or the importance of these

relationships to her. From the start of these extremely troubling, high-conflict proceedings, the adults in M.V.'s life gave difficult-to-reconcile accounts of her behavior, attachments, and relationships that tended to align with their preferences for her ultimate placement. All these considerations abundantly justified the court's initial conclusion that a bonding study was appropriate in this complex case.

Unfortunately, the evaluator appears to have profoundly misconceived his role. "The proper factors the study, at a minimum, should have considered, recognizing that rarely do parent-child relationships conform to an entirely consistent pattern, are set out in *Caden*: 1) the age of the child; 2) the portion of the child's life spent in the parent's custody; 3) the positive or negative effect of interaction between the parent and the child; and (4) the child's particular needs." (*In re M.G.* (2022) 80 Cal.App.5th 836, 850 (*M.G.*).) Crespo did not analyze these factors, nor did he analyze the nature of M.V.'s attachment to her parents or the effect that severing it would have on her. He failed to observe visits between M.V. and her parents, choosing to use the two visits he briefly witnessed to question M.V. and others rather than watching M.V.'s interactions with her parents. M.V. had little to no privacy when questioned by Crespo during her visits, and he did not speak with her on any other occasion.

Instead of studying M.V.'s relationship with her parents and the potential consequences to her of its loss, Crespo assessed the parents in extreme detail in ways that bore no discernable connection to the psychological importance to M.V. of her relationship with her parents. He performed psychological evaluations of the parents, assessed their fitness to resume

34

custody, and rendered opinions on the advisability of certain permanent placement possibilities.

Crespo's report reflected this extreme focus on the parents and the inadequacy of his information gathering on the subjects the court asked him to evaluate. Crespo barely paid attention to M.V. in his report. His "psychological evaluation" of her consisted of a recitation of his interview of Mary V. and a description of his participation in M.V.'s visits with her parents. Although M.V. had told him she wanted to continue visiting her parents, Crespo merely said his observation of the parents' visits "suggested that the minor has some attachment to her mother, and that at the very least, feels comfortable in their presence." Instead of analyzing, or even describing, M.V.'s relationships with her parents and the importance of those relationships to her, Crespo just reported that from what Mary V. and Father had told him, it appeared M.V. had been cared for mostly by paternal relatives and "may be most attached to her grandmother." Neither of those pieces of information is relevant to the analysis the court requested, or to the question ultimately before the court. (See *In re L.A.-O.* (2021) 73 Cal.App.5th 197, 209 [day-to-day contact is typical, but not required, for a significant emotional attachment to exist]; *In re J.D.* (2021) 70 Cal.App.5th 833, 859 [parent need not prove a child's attachment to that parent is their primary bond; the exception can apply when a child has bonded to an alternative caretaker].)

Crespo also opined on topics beyond the scope of the assigned assessment, such as the parents' inability to provide for M.V.'s needs; the likelihood they could regain custody; the risks they could pose to M.V. if she were in their custody; his lack of optimism that the parents, especially Mother, would improve

35

psychologically in the near future; and the possibility that M.V. was more attached to paternal grandmother than to Mother. He offered unsolicited opinions about the best permanent plan for M.V., opining she could not safely be placed in the parents' custody (which, per *Caden C.*, *supra*, 11 Cal.5th at page 630, was not an available option), and asserting adoption by the paternal grandparents rather than a legal guardianship with them would be in her best interest.

Crespo's preference for adoption over guardianship rested on the legally untenable and factually questionable idea that adoption would leave M.V.'s relationship with her parents unchanged because the grandparents would permit continued contact with the parents. This is entirely the opposite of the legal effect of adoption. (*Caden C.*, *supra*, 11 Cal.5th at p. 633 ["Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship"].) Crespo's belief—that adoption would preserve M.V.'s status quo more than guardianship would—prompted him to discount the potential negative impacts of adoption to the point that he did not even describe them. Instead, he acknowledged adoption caused long term, and possibly also short term, "negative consequences," but he assumed that adoption would *prevent* M.V. from losing her parents and thus being vulnerable to those unidentified negative consequences. As a result of Crespo's assumption that M.V.'s relationships with her parents would be undisturbed by adoption, his report entirely failed to address the consequences to M.V. if her relationships with her parents were terminated.

In light of Crespo's observational failures and his nonresponsive report, both parents asked the court to direct him to conduct the in-person observations he had been expected to perform and to submit a new report assessing M.V.'s bond to them and the anticipated consequences to her if those relationships were severed. The court declined to do so, stating any issues could be addressed in argument. This was an abuse of discretion. (*Lorenzo C.*, *supra*, 54 Cal.App.4th at p. 1341.) By ordering the bonding study, the court had indicated its well-founded conclusion that it would benefit from expert evidence and additional information in performing the complex, factually nuanced determination whether M.V.'s relationships with her parents were so significant that it would be detrimental to her to sever them. The inadequate report did not supply that information, and there is no indication in the record on appeal of any change in circumstances after the bonding study was ordered that could have obviated the need for an assessment.

Moreover, ordering a supplemental bonding study would not have delayed the permanency hearing. At the same hearing where the parents requested a supplemental study, the court continued the .26 hearing for three months for ICWA compliance. As Crespo had taken approximately two months to submit his initial report, there is no reason to believe three months would not have been sufficient for him or another expert to perform a proper bonding study. (Cf. *In re Richard C.* (1998) 68 Cal.App.4th 1191, 1197 [not an abuse of discretion to deny a belated request for a bonding study that would delay a child's permanent placement].) Finally, contrary to the court's statement, argument was not an adequate vehicle for addressing the gross deficiencies in the report. No amount of argument

could supply the observations and expert analysis a true bonding study would have provided. For all these reasons, under the very specific circumstances of this case, we conclude it was an abuse of discretion not to order a supplemental bonding study in response to Crespo's inadequate, nonresponsive assessment.

## II. *Termination of Parental Rights*

The parents contend the court erred when it relied upon Crespo's report to determine that the beneficial parental relationship exception to the termination of parental rights did not apply. (§ 366.26, subd. (c)(1)(B)(i).) It appears the court failed to properly evaluate whether M.V. had a substantial, positive emotional relationship with her parents and that it relied on improper considerations when it attempted to determine whether termination of the parental relationship would be detrimental to her.

### A. Applicable Law and Standard of Review

"To guide the court in selecting the most suitable permanent arrangement" for a dependent child who cannot be returned to a parent's care, section 366.26 "lists plans in order of preference and provides a detailed procedure for choosing among them." (*Caden C.*, *supra*, 11 Cal.5th at p. 630; see § 366.26, subd. (b).) At the permanency planning hearing, if the court finds that the child is likely to be adopted and that "there has been a previous determination that reunification services be terminated, then the court shall terminate parental rights to allow for adoption. But if the parent shows that termination would be detrimental to the child for at least one specifically enumerated reason, the court should decline to terminate parental rights and

38

select another permanent plan." (*Caden C.*, at pp. 630–631; see § 366.26, subd. (c)(1)(B)(i)-(vi), (4)(A).)

One of the exceptions, the beneficial parental relationship exception, applies when (1) "the parent has regularly visited with the child"; (2) "the child would benefit from continuing the relationship"; and (3) "terminating the relationship would be detrimental to the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 629; see § 366.26, subd. (c)(1)(B)(i).) "The first element—regular visitation and contact—is straightforward. The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.' " (*Caden C.*, at p. 632.)

To establish the second element, that the child would benefit from continuing the parental relationship, the parent must show the child has a "substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship." (*Caden C.*, *supra*, 11 Cal.5th at p. 636.) The "focus is the child," and "the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' " (*Id.* at p. 632.)

"Concerning the third element—whether 'termination would be detrimental to the child due to' the relationship—the court must decide whether it would be harmful to the child to sever the relationship and choose adoption." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) "When it weighs whether termination would be detrimental, the court is not comparing the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s). . . . Accordingly, courts should not look to

whether the parent can provide a home for the child." (*Id*. at p. 634.) "When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due to*' the child's beneficial relationship with a parent." (*Id*. at pp. 633–634.)

The parent bears the burden to show the statutory exception applies. (*In re Derek W.* (1999) 73 Cal.App.4th 823, 826.) When a parent meets that burden, the beneficial parental relationship exception applies such that it would not be in the best interest of the child to terminate parental rights. In that case the court must select a permanent plan other than adoption. (*Caden C., supra*, 11 Cal.5th at pp. 636–637.)

We review the court's findings using a hybrid approach: for the first two elements, which require factual findings (parental visitation and the child's emotional attachment), we apply the substantial evidence standard of review; and for the court's weighing of the relative harms and benefits of terminating parental rights, we use the abuse of discretion standard. (*Caden C., supra*, 11 Cal.5th at pp. 639–640.)

B.      The Juvenile Court Failed to Properly Analyze the Second and Third Elements of the *Caden C.* Analysis

The first element of the exception, regular visitation, is not in dispute; by all accounts the parents maintained regular visitation and contact with M.V.

1.      *Element Two*

On the second element, whether the child would benefit from continuing the relationship, "it is critical for the juvenile court at the second step of the analysis to consider the evidence

40

showing whether the parent's actions or inactions 'continued or developed a significant, positive, emotional attachment from child to parent.' " (*In re B.D.* (2021) 66 Cal.App.5th 1218, 1230.)  It does not appear the court properly examined the nature of the parent-child relationship to evaluate whether M.V. had a significant, positive, emotional attachment with her parents.

The court's analysis of this element was cursory.  The court acknowledged M.V. wanted to remain in contact with her parents, wished to live with both her parents and her grandparents, and would be sad if she could not see her parents again.  Then, the court began to perform the weighing involved in the third element before it caught itself and returned to element two: "In balancing this, the court put significant weight on—and I must say that—so there's really not a question as to whether or not there's a bond.  There clearly is a bond with the child and particularly the father, it appears."  Then the court moved on to analyzing the third element.

But the second element is not, "Is there a bond?"  The question is whether M.V. had a "substantial, positive, emotional attachment to the parent[s]—the kind of attachment implying that the child would benefit from continuing the relationship." (*Caden C.*, *supra*, 11 Cal.5th at p. 636.)  The court does not appear to have evaluated the quality of the parent-child relationships or to have considered factors such as M.V.'s age, how much of her life she spent in her parents' custody, the positive or negative effects of interaction with the parents, and M.V.'s particular needs.  (*Id.* at p. 632.)  This was error.

###	2.	*Element Three*

The court's lack of analysis of the second element left it unable to perform the weighing required by the third element,

whether it would be detrimental to sever M.V.'s relationship with her parents. By reducing element two to "a bond" rather than examining the relationship, the court could not properly assess "whether losing the relationship with the parent would harm the child to an extent not outweighed, on balance, by the security of a new, adoptive home." (*Caden C.*, *supra*, 11 Cal.5th at p. 634.)

Additionally, the court considered improper factors when it evaluated the third element. The court stated that it "gave much weight to Dr. Crespo's analysis in this case," and it adopted Crespo's analysis that a guardianship would be more disruptive to M.V. than adoption would be. Specifically, the court "embrace[d]" Crespo's "sentiment" that "legal guardianship may create a false hope for the parents to eventually regain custody of the minor and, hence, introduce uncertainty and/or conflict among the parents and the paternal relatives[,] thereby creating a risk of more emotional problems in the child that would otherwise be avoided through adoption by the parents [*sic*]." The court also "trust[ed] that the grandparents are acting in the best interest of their child, that they recognize that adopted children always wonder who their birth parents are. And we—it's quite common, [especially] now with DNA testing, that adopted children will track down their birth parents and attempt to develop a relationship."

This analysis was improper. First, it was not a determination of "how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life," and whether terminating M.V.'s attachment to her parents would, on balance, be detrimental to her. (*Caden C.*, *supra*, 11 Cal.5th at pp. 633, 636; see § 366.26, subd. (c)(1)(B)(i).)

42

Second, to the extent the court relied on the expectation of continued contact between M.V. and the parents after adoption, this was an impermissible consideration. "Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship." (*Caden C.*, at p. 633; see also *In re S.B.* (2008) 164 Cal.App.4th 289, 300 ["We do not believe a parent should be deprived of a legal relationship with his or her child on the basis of an unenforceable promise of future visitation by the child's prospective adoptive parents"].)

Third, the court's duty was to determine whether there was a "compelling reason for determining that termination [of parental rights] would be detrimental" to M.V. (§ 366.26, subd. (c)(1)(B)), not to compare the pros and cons of adoption and legal guardianship and then choose between them. Guardianship is not to be considered as a permanent plan unless and until adoption, the statutorily preferred option, is not appropriate. "Adoption is the Legislature's preferred permanent plan. [Citation.] ' "Only if adoption is not possible, or if there are countervailing circumstances, or if it is not in the child's best interests are other, less permanent plans, such as guardianship or long-term foster care considered." ' " (*In re D.M.* (2012) 205 Cal.App.4th 283, 290.) "When a juvenile court bases its decision to terminate parental rights on improper factors, the [] court abuses its discretion." (*M.G.*, *supra*, 80 Cal.App.5th at p 852.)

By failing to determine whether M.V. had a substantial, positive attachment to her parents, and by relying on improper factors in assessing detriment, the court failed to perform the

43

appropriate analysis when determining if the beneficial parental relationship exception applied.  Therefore, we reverse the juvenile court's order and direct the court to conduct a proper analysis under the *Caden C.* framework once it has received a bonding study.

## DISPOSITION

The order terminating parental rights is vacated and the matter remanded so a bonding study may be prepared and a new section 366.26 hearing conducted.

**CERTIFIED FOR PUBLICATION**


STRATTON, P. J.

We concur:



GRIMES, J.



WILEY, J.